**William Charles MALONE, Appellant**

v.

**The STATE of Texas, Appellee.**

No. 06–04–00045–CR.

Court of Appeals of Texas,
Texarkana.

Submitted Nov. 19, 2004.

Decided April 28, 2005.

Alex Tyra, Law Office of Alex Tyra, Longview, for appellant.

Ray Bowman, Asst. Dist. Atty., Longview, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

A Gregg County jury found William Charles Malone guilty of aggravated sexual assault, sexual assault, and indecency with a child in connection with the sexual abuse of his daughter, J.M., age thirteen at the time of her outcry. The jury then recommended punishment of thirty years' confinement each for the offenses of aggravated sexual assault and sexual assault, and twenty years' confinement for the conviction for indecency with a child. Having requested and heard statements of counsel regarding stacking of the three sentences, the trial court followed the jury's recommendations for sentencing and ordered that the sentences run consecutively. On appeal, Malone contends that the trial court erred in admitting expert testimony offered by the State, that the trial court erred by overruling his motion to suppress, that the trial court erred in refusing to instruct the jury on the legality of the search that yielded certain items of evidence, and that the sentences imposed were disproportionate. We affirm.

## I. EXPERT TESTIMONY

In his first point of error, Malone complains of the trial court's admission of the testimony of the State's expert witness,

Jamie English, the program director at the Children's Advocacy Center of East Texas in Longview.

## A. English's Qualifications and Testimony

English testified she had earned a bachelor's degree in social work and was working toward her master's degree. She is a licensed social worker and a member of the American Professional Society on the Abuse of Children. She testified she had completed more than 600 forensic interviews of children. Additionally, she had been to several week-long training sessions relating to topics concerning child abuse and family violence. She also attended several conferences on forensic interviewing of child victims. Although she had testified in other cases, she had not been qualified as an expert. She reviewed the police report and several scholarly articles before testifying. The articles concerned incest, situational offenders versus pedophilia, and narcissistic personality disorder.

On voir dire, English explained she "would testify to the types—the different types of pedophilia versus situational offender and narcissistic personality disorder...." Concluding that her generalized testimony would aid the jury, the trial court overruled Malone's objections to the expert testimony.

Before the jury, English testified that, in general, some individuals turn to children as sexual partners because those individuals may have personality defects. Relying on the Diagnostic and Statistics Manual (DSM–IV), she described the characteristics of narcissistic personality disorder and explained that this is one type of

personality who may commit incest. She also provided general testimony about child abuse victims. She did not specifically diagnose Malone as an incest perpetrator.

## B. Applicable Law: Rule of Evidence and Cases

Rule 702 of the Texas Rules of Evidence [1] states if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX.R. EVID. 702; *Alvarado v. State*, 912 S.W.2d 199, 215 (Tex.Crim.App. 1995).

■ Under TEX.R. EVID. 702, the trial court must be satisfied that three conditions are met before expert testimony is admitted: (1) the witness qualifies as an expert by reason of his or her knowledge, skill, education, training, or experience; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the jury in deciding the case. *Alvarado*, 912 S.W.2d at 215–16; *Hardin v. State*, 20 S.W.3d 84, 91 (Tex. App.-Texarkana 2000, pet. ref'd); *Bui v. State*, 964 S.W.2d 335, 344 (Tex.App.-Texarkana 1998, pet. ref'd). Malone challenges the trial court's admission of English's testimony on the grounds that she was not properly qualified and that her testimony was not sufficiently reliable to assist the jury.

### 1. Qualification Inquiry

1. Rule 702 is equally applicable to both Texas civil and criminal cases and is worded the same as FED.R.EVID. 702 (except for a comma). Thus, in a Texas criminal case, Texas civil cases and federal cases may be looked to for guidance. *Roise v. State*, 7 S.W.3d 225, 234 n. 3 (Tex.App.-Austin 1999, pet. ref'd).

■ No rigid formula exists for determining whether a particular witness is qualified to testify as an expert. *Alvarado*, 912 S.W.2d at 215–16; *Hardin*, 20 S.W.3d at 91; *Bui*, 964 S.W.2d at 344. The United States Supreme Court emphasized that this inquiry was "a flexible one." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The expertise must be measured against the particular opinion the expert is offering. *Roise*, 7 S.W.3d at 234. While the proponent of the testimony has the burden of establishing the expert's qualifications, the trial court has the responsibility to ensure that "those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex.1996); *see Matson v. State*, 819 S.W.2d 839, 851 (Tex. Crim.App.1991).

■ A degree alone is not enough to qualify a purported expert to give an opinion, as the case may be, on every conceivable medical question, legal question, or psychological question. *Roise*, 7 S.W.3d at 234. The inquiry must be into the actual qualification. That is, there must be a "fit" between the subject matter at issue and the expert's familiarity therewith. *See Broders*, 924 S.W.2d at 153. The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the trial court which would qualify the expert to give an opinion on that particular subject. *Id.*

### 2. Reliability Inquiry

■ The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently reliable and relevant to assist the jury in understanding other evidence or in determining a fact issue. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000);

*Salazar v. State*, 127 S.W.3d 355, 359 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd [4 pets.] ).

■ In *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App.1998), the Texas Court of Criminal Appeals stated "an appropriately tailored translation of the *Kelly* test" for expert testimony outside the hard sciences. When the expert is from a discipline which involves technical or other specialized knowledge, experience, and training as opposed to the scientific method, the test for reliability is: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on and/or utilizes the principles involved in the field. *See Weatherred*, 15 S.W.3d at 542; *Nenno*, 970 S.W.2d at 561.

### C. Standard of Review

■ We review the trial court's decision to admit expert testimony for abuse of discretion. *Alvarado*, 912 S.W.2d at 216; *Hardin*, 20 S.W.3d at 90. The test for determining whether an abuse of discretion occurred is not whether the facts present an appropriate case for the trial court's action; rather, the test is whether the trial court acted without reference to any guiding rules and principles, or in other words, acted in an arbitrary and unreasonable manner. *Roise*, 7 S.W.3d at 233.

### D. No Abuse of Discretion in Admission of Expert Testimony

#### 1. On English's Qualifications and Scope of Her Expertise

##### a. Opinions on Abuse Victims' Tendencies

■ Clearly, the trial court did not abuse its discretion by concluding English was an expert who could testify as to the behavioral tendencies of child abuse victims, in light of her extensive education in the field of social work, her extensive training through conferences on child abuse and family violence, and her specialized experience in conducting over 600 forensic interviews of child victims.

### b. Opinions on Offender Profiles

■ The "fit" between English's expertise and her testimony on the types of incest offenders is less comfortable. First, to the extent her testimony was based on the DSM–IV, Malone waived any error when he affirmatively did not object to the admission of the portion of the DSM–IV on the topic of narcissistic personality disorder. *See Moraguez v. State*, 701 S.W.2d 902, 904 (Tex.Crim.App.1986). When the State offered the excerpt from the manual, Malone stated that he "[has] no objection as to a summary of her testimony."

■ As to the remainder of English's testimony on offender profiles, that which she based largely on articles from the internet, the question is whether English testified within the scope of her expertise by incorporating as her own those opinions expressed in the reviewed articles. She did have advanced education and training in a behavioral sciences field, had significant experience dealing with the victims of abuse, and had attended training conferences on child abuse and family violence. Her testimony seems to lie in a more specialized field, one relating to psychological profiles of the sexually deviant and one probably better suited to one in that specific field.[2] While such a situation may easily run afoul of the *Nenno* standard and

we urge caution in this scenario, here we have a unique set of circumstances. English had extensive experience in dealing with sexually abused victims. Considering her experience and her education in the behavioral sciences in general and in the area of child abuse more specifically, she is in a position in which she would be able to evaluate, interpret, and incorporate research articles on topics of personality types with the tendency to commit incest.

While we may not have made the same determination as the trial court on this matter, we cannot conclude the trial court's decision fell outside the zone of reasonable disagreement. Considering English's education, training, and experience, the trial court did not act arbitrarily or unreasonably in overruling Malone's objection to English's expert testimony on the basis of her qualifications.

### 2. On the Reliability of English's Testimony

■ As to the reliability of her testimony, the trial court also acted within its discretion by overruling Malone's objections. In preparation for her testimony, English reviewed several journal articles on the characteristics of incest offenders and narcissistic personality disorders. She testified she applied the profile of the situational offender as a possibility on these facts. She explained that the situational offender is not an individual who has sexual urges for children. Rather, the situational offender may act on some sexual urges in certain circumstances. She reviewed research on the situational offender explaining how an individual may have only one or two victims rather than several. She then explained how the profile of and the theories underlying the

---

2. See *Hardin,* 20 S.W.3d at 91, for the qualifications of an expert with a focus in this specialized field.

situational-offender diagnosis have developed over time.

She then testified that a narcissistic personality disorder can be linked to a situational offender. To explain the narcissistic personality disorder, as a personality type connected with commission of incest, she relied heavily on the diagnosis descriptions found in the DSM–IV, the psychological standard recognized in the fields of behavioral science such as psychology and social work, which was introduced without objection. Based on this testimony, the trial court was reasonable in determining that English's testimony satisfied the reliability inquiry under *Nenno*. We overrule Malone's first point of error.

## II. MOTION TO SUPPRESS

### A. Two Searches of the Malone Residence

#### 1. April 26, 2002

This first search was a warrantless search, based on a consent-to-search form signed by James Malone, appellant Malone's hearing-impaired brother. On April 26, 2002, the day of J.M.'s outcry, Sergeant Terry Roach, Officer Carol Brian, Child Protective Services (CPS) investigator Audrey Hobson, J.M., J.M.'s older brother, and James left the police station and went to the Malone residence to get the children's personal belongings and to retrieve a bullwhip, pairs of panties, and a nightgown referenced in J.M.'s allegations.

Having already entered the house, Roach obtained a consent form from James. He explained that, since James is hearing-impaired, the officers had to get J.M. or her brother to translate for them. James is deaf and is unable to speak. Roach also testified that James lived at the residence and "stayed in the living room." Roach testified that the officers explained, through translation, the nature of the form

James was asked to sign and that James had come from the police station, where he had submitted a statement on the alleged crimes. J.M.'s account of the police interaction with James was markedly different from that of the officer, however.

For purposes of our analysis, we will treat separately the search of Malone's bedroom and the search of common areas. Based on James's consent, officers seized from underneath Malone's bed a yellow folder containing mostly drawings of nude women, a gray plastic mechanical device, a Polaroid camera, twelve *Playboy* magazines, and some marihuana and drug paraphernalia. The officers seized an adult videotape and an innocuous photograph of Malone and J.M. from the common areas of the house. Also, J.M. turned over to the officers the articles of clothing referred to in her allegations against Malone.

#### 2. May 1, 2002

The second search of the residence was based on a search warrant obtained after Malone's acquaintance spoke with investigating officer, Page Johnson, and directed him to the location of nude photographs. Malone does not complain of the legality of this second search.

### B. Standard of Review

At a hearing on a motion to suppress evidence, the trial court is the sole and exclusive trier of fact and the judge of the credibility of witness testimony. *Allridge v. State*, 850 S.W.2d 471, 492 (Tex.Crim.App.1991). We review the trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing de novo the court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000).

## C. Consent Search of Malone's Bedroom

### 1. Actual Authority

■ Consent to search is one of the well-established exceptions to the constitutional requirements that an officer have both a warrant and probable cause before a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Carmouche*, 10 S.W.3d at 331. A warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's protection against unreasonable searches and seizures if the officers have obtained the consent of a third party who possesses common authority over the premises · or effects to be searched. *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "Common authority" rests "on mutual use of property by persons generally having joint access or control for most purposes." *Id.* at 170 n. 7, 94 S.Ct. 988. A third party may properly consent to a search when the party has equal control over and equal use of the premises being searched. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex.Crim.App.2002); *Becknell v. State*, 720 S.W.2d 526, 528 (Tex.Crim.App. [Panel Op.] 1986); *Rivera v. State*, 59 S.W.3d 268, 273 (Tex.App.-Texarkana 2001, pet. ref'd); *Corea v. State*, 52 S.W.3d 311, 316 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd).

The Texas Court of Criminal Appeals has recognized the privacy considerations in an individual's bedroom when it held as inadmissible the evidence seized from an adult son's bedroom in a search authorized by the father/homeowner. *See Becknell*, 720 S.W.2d at 528. In *Becknell*, the father testified he was allowed to go into his son's bedroom "only when [his son] was there." *Id.* The evidence also showed that appellant Becknell had the only key to the locked room. *Id.* The court concluded the father did not have actual authority to consent to a search of the son's bedroom.[3]

The locked or unlocked distinction became less important in *Corea*. The State showed that the appellant's brother-in-law did have authority to common areas of the apartment. *Corea*, 52 S.W.3d at 316. However, the State failed to show that the brother-in-law had the authority to consent to a search of the appellant's bedroom. *Id.* The *Corea* court rejected the State's argument that the open door to the bedroom was evidence showing the brother-in-law's common authority over the bedroom. *Id.* at 316–17. The brother-in-law had told police at the scene that no one other than Corea lived in the bedroom, and so, the court concluded, the brother-in-law did not have equal control and access to the bedroom that would give him the authority to consent to a search of the bedroom. *Id.* at 316.

■ Here, Sergeant Roach testified that James lived in the house, but added that James "stayed in the living room." When asked if James occupied the same bedroom as Malone, investigating officer Johnson[4] answered, "Not to [his] knowledge." From this, we conclude the State failed to show that Malone's adult brother,

---

**3.** The court ultimately determined that admission of the items seized from the bedroom did not contribute to Becknell's conviction and, thus, was harmless error. *Becknell,* 720 S.W.2d at 530. The court did not address the "apparent" authority doctrine or the reasonableness of the officers' belief that the father could consent to the search. *Becknell* was decided four years before the United States Supreme Court decision in *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

**4.** Johnson testified at trial from his report on the search, but was not present during this first search.

although living in the house, had equal control of Malone's bedroom. That being said, James did not have actual authority to consent to a search of Malone's bedroom.

## 2. Apparent Authority

■ When the facts do not support a finding of actual authority, a search is reasonable if the consent giver apparently has actual authority. *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793. In *Rodriguez*, the United States Supreme Court held that a warrantless entry by law enforcement officers onto a person's premises does not violate the protection against unreasonable searches and seizures under the Fourth Amendment when such entry is based on the consent of a third party whom the officers, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not possess such authority.

■ If officers reasonably believed that the third party had common authority over the place to be searched, then their good-faith mistake will not invalidate the search. This deference does not mean, however, that they may rely on consent given in ambiguous circumstances or that clearly appears unreasonable. *Riordan v. State*, 905 S.W.2d 765, 771 (Tex.App.-Austin 1995, no pet.). While the apparent authority doctrine should not be applied so

strictly that it places too heavy a burden on police, it cannot allow law enforcement officers to proceed without inquiry into ambiguous circumstances or to always accept at face value the consenting party's apparent assumption or claim of authority to allow the contemplated search. *Id.*

We acknowledge that the Texas Court of Criminal Appeals has not expressly adopted the apparent authority doctrine.[5] *McNairy v. State*, 835 S.W.2d 101, 105 (Tex.Crim.App.1991). Without formally adopting the doctrine, the court found it to be of some value in the resolution of *McNairy*. *Id.* It noted that the apparent authority doctrine was helpful in determining whether the officers were justified "in being where they were" when probable cause to conduct a warrantless search arose. *Id.* Citing *Rodriguez*, the court went on to explain that, should "ambiguous circumstances" arise which cast doubt on the effectiveness of the consent or the extent of the consent given, the officers "must stop and make inquiries as to the continued effectiveness of the consent." *Id.* The *McNairy* court rejected the application of the apparent authority doctrine under the evidence in that case. *Id.*

■ The State bears the burden of proving that the person who gave consent had the actual or apparent authority to do

5. Numerous intermediate appellate courts in this state have expressly recognized the apparent authority doctrine. *See, e.g., Davis v. State*, 93 S.W.3d 664, 668 (Tex.App.-Texarkana 2002, pet. ref'd); *Corea*, 52 S.W.3d at 317; *Riordan*, 905 S.W.2d at 771. *See also Mathis v. State*, No. 2-02-320-CR, 2004 WL 2008602, at 5-6, 2004 Tex.App. LEXIS 8281, at 14-16 (Tex.App.-Fort Worth Sept. 7, 2004, pet. ref'd) (not designated for publication); *Wilson v. State*, No. 04-02-00805-CR, 2004 WL 624541, at 1, 2004 Tex.App. LEXIS 2810, at *3 (Tex.App.-San Antonio Mar.31, 2004, no pet.) (not designated for publication); *Giles v.*

*State*, No. 08-01-00080-CR, 2003 WL 68178, at 4, 2003 Tex.App. LEXIS 165, at *14 (Tex.App.-El Paso Jan.9, 2003, no pet.) (not designated for publication); *Cody v. State*, 2001 WL 1002666, at 1, No. 13-00-402-CR, 2001 Tex.App. LEXIS 4288, at *2 (Tex.App.-Corpus Christi June 28, 2001, no pet.) (not designated for publication); *Speir v. State*, Nos. 05-00-01257-CR, 05-00-01258-CR, 05-00-01259-CR, 2001 WL 722483, 3-4, 2001 Tex.App. LEXIS 4260, at *9-10 (Tex.App.-Dallas June 28, 2001, no pet.) (not designated for publication).

so.[6] *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793. The State cannot satisfy this burden if officers proceed without making further inquiry into an ambiguous situation. *Corea,* 52 S.W.3d at 317. If the officers do not learn enough and if the circumstances make it unclear whether the property is subject to "common authority" by the person giving consent, "then warrantless entry without further inquiry is unlawful unless authority actually exists." *Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. 2793.

In *Riordan,* an officer, acting on a tip from Riordan's twelve-year-old son, conducted a warrantless search of Riordan's home based on the consent of an elderly woman, who was the only person present at the time of the officers' arrival. *Riordan,* 905 S.W.2d at 768–69. The officers learned the woman's name and her purpose for being there. They also learned the location of her separate residence and that the homeowners would be home shortly. *Id.* at 768. The officers seized marihuana from the master bedroom and the home office. *Id.* at 768–69. At the hearing on the motion to suppress, it was determined that the woman who consented to the search was Riordan's mother-in-law, who lived in a nearby house Riordan and his wife had built for her on their property. *Id.* at 769.

The mother-in-law ate her meals at the Riordan home and also sometimes watched television there. *Id.* On occasion, as was the case at the time of this search, she also acted as a babysitter for Riordan's twelve-year-old son while Riordan and his wife were at work. *Id.* The wife testified that her mother was expressly denied access to the office and master bedroom. *Id.*

The Austin Court of Appeals held that the mother-in-law did not have actual authority to consent to the search of the bedroom and office and that "[t]he officer's superficial and cursory questioning of [the mother-in-law] simply did not disclose sufficient information to support a reasonable belief that she had the authority to permit the search." *Id.* at 772.

Similarly, in *Corea,* since the brother-in-law had informed the police that no one other than Corea lived in the bedroom, the circumstances did not support a reasonable belief that the brother-in-law had authority to consent to the search of the bedroom. *Corea,* 52 S.W.3d at 317. When the circumstances regarding the brother-in-law's authority to consent appeared ambiguous, the police were obligated to investigate further and/or obtain a search warrant. *Id.* Their search without having done so was unreasonable.[7] *Id.*

---

**6.** Citing to our decision in *Taylor v. State,* the State argues that Malone failed to show who had access to the bedroom or what Malone's expectations were with respect to others' access to his bedroom. *See Taylor v. State,* 995 S.W.2d 279, 281 (Tex.App.-Texarkana 1999, pet. dism'd). The State's reliance on *Taylor* is misplaced in that *Taylor* dealt with issues of standing, rather than consent. Additionally, this position confuses the burden at a hearing on a motion to suppress. When seeking the suppression of evidence based on allegations of unlawful search and seizure, the accused bears the burden of rebutting the presumption that the police conduct was proper. *Russell v. State,* 717 S.W.2d 7, 9 (Tex.Crim.App. 1986). The presumption is rebutted by a showing that the search or seizure occurred without a warrant. *Harris v. State,* 994 S.W.2d 927, 930 (Tex.App.-Waco 1999, pet. ref'd). The burden then shifts to the State. *Id.* If the State is unable to produce a warrant, it must prove the warrantless search or seizure was reasonable. *Id.* Similarly, the State has the burden of showing the search did not exceed the scope of appellant's consent. *See Gilmore v. State,* 666 S.W.2d 136, 149 (Tex.App.-Amarillo 1983, pet. ref'd).

**7.** Because the invalid search yielded otherwise unsuspected contraband, the court determined that the error in admission of the evidence did contribute to Corea's conviction for possession with intent to deliver and, thus,

### 3. No Showing of Apparent Authority to Consent To Search of Bedroom

■ Likewise, the circumstances surrounding James's authority to consent to a search of Malone's bedroom are ambiguous. Since the officers proceeded without further inquiry in the face of this ambiguity, they acted unreasonably with respect to their search of Malone's bedroom based on James's consent.

In *Davis,* 93 S.W.3d at 668, this Court held that officers were reasonable in concluding that a female, who stated she lived in the one-bedroom residence, had authority to consent to a search. In the bedroom, officers found a firearm under the bed and, subsequently, Davis was prosecuted for possession of a firearm as a felon. The trial court overruled Davis's motion to suppress the firearm. *Id.* at 665, 668. Later, it was determined that the female who consented to the search was an in-law that stayed with Davis on weekends. *Id.* at 668. While she did not have actual authority to consent to the search of the bedroom, the officers were reasonable in believing that a female living in a one-bedroom residence had equal access to the bedroom. *Id.* The same cannot be said under the circumstances here, however, where it is far less likely that two grown brothers will share a bedroom and, more obviously, where officers discovered James did not occupy the bedroom.

Again, investigating officer Johnson indicated he knew James did not share the bedroom with Malone. Sergeant Roach testified that James "stayed in the living room." Therefore, it was not reasonable for the officers to proceed with the warrantless search pursuant to the apparent authority of James to consent to a search of Malone's bedroom. As were the officers in *Corea,* the police officers here were

obligated either to investigate further to determine if James had the authority to consent to a search of the bedroom, or obligated to obtain a search warrant. *See Corea,* 52 S.W.3d at 317–18. We conclude the trial court erred in denying the motion to suppress because the State did not sustain its burden of establishing that James had actual or apparent authority to consent to the search of Malone's bedroom. That is, regardless of whether James gave voluntary consent, this portion of the search is invalid because James legally could not give consent to a search of the bedroom.

The fruits of this unlawful search and seizure are those items seized from Malone's bedroom: a yellow folder of drawings, a bag of marihuana, drug paraphernalia, a gray plastic mechanical device, a Polaroid camera, and twelve *Playboy* magazines. These items were seized unlawfully and should have been excluded from evidence.

### 4. No Reversible Error in Admission of Items Seized From Bedroom

■ We next determine if the error in the trial court's overruling Malone's motion to suppress the six items recovered from the bedroom constitutes reversible error. *See* TEX.R.APP. P. 44.2. The error here is constitutional error because an unlawful search by the State violates both the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. *See* TEX.R.APP. P. 44.2(a). If the record reveals constitutional error that is subject to harmless error review, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX.R.APP. P. 44.2(a); *see Hernandez v.*

was reversible error. *Corea,* 52 S.W.3d at 317–18.

*State*, 60 S.W.3d 106, 108 (Tex.Crim.App. 2001).

In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and its connection with other evidence, and whether the State emphasized the error. *See Motilla v. State*, 78 S.W.3d 352, 357–58 (Tex.Crim.App.2002); *Strong v. State*, 138 S.W.3d 546, 555 (Tex. App.-Corpus Christi 2004, no pet.).

The marihuana and drug paraphernalia seized from Malone's bedroom were wholly unrelated to the offense with which Malone was charged and for which he was, ultimately, convicted. The magazines were relatively innocuous, as well, in relation to Malone's crimes. Similarly, the camera, in and of itself, has only minimal bearing on the crimes of aggravated sexual assault and indecency with a child here where, although J.M. testified Malone took nude photographs of her, no nude photographs of J.M. were ever produced. The yellow folder contained mostly classic rock-and-roll song lyrics, illustrated mottos, and amateur drawings of nude women, none of which have a strong tendency to support an allegation of sexual assault or indecency with a child.

We conclude the evidence seized from the bedroom was not necessary to the State's case against Malone. *See Strong*, 138 S.W.3d at 555. J.M.'s own uncontradicted and detailed account of the abuse, testimony from friends and family, and the items J.M. turned over to police were at the heart of the State's case. Considering the substantial evidence supporting the jury's verdict, the nature of the items unlawfully seized, and the little emphasis placed on the evidence at issue, we determine the error did not contribute to Malone's conviction.

**D. Search of the Common Areas of the Residence**

**1. Voluntariness of Consent To Search**

The voluntariness of a consent to search is a mixed question of law and fact. *Reyes–Perez v. State*, 45 S.W.3d 312, 316 (Tex.App.-Corpus Christi 2001, pet. ref'd). The United States Constitution requires only that the State prove voluntariness of consent by a preponderance of the evidence, while the Texas Constitution requires the State to prove voluntariness of the consent by clear and convincing evidence. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000); *Carmouche*, 10 S.W.3d at 331. We have held that James could not have consented to a search of Malone's bedroom. We now address the issue whether the State met its substantial burden regarding a showing that James knowingly and voluntarily consented to the search of the rest of the residence.

**2. Communication with James and Search of the Common Areas**

Sergeant Roach testified he explained the consent to search form to James through translation by J.M. or her brother. Roach also explained that James had accompanied the group to the Malone residence from the police station, where James had made a statement through an interpreter. He was not aware of whether James could read. Roach testified he had no doubt as to whether James understood he was consenting to a search of the residence.

However, J.M.'s account of the police interaction with James was very different. She mentioned the presence of a family friend who might have been at the house and tried to explain the search to James,

even though the friend did not know sign language. J.M. described the police officers trying to communicate with James through gestures. Taken as true, this type of communication would probably not have been sufficient to sustain the burden to show voluntary consent by clear and convincing evidence. *See Reyes–Perez*, 45 S.W.3d at 319. When asked whether the officers asked her to communicate with James, J.M. testified that she did not think so. She could not remember whether the officers enlisted the help of her brother in communicating with James.

From the common areas of the residence and independent of both J.M.'s efforts and the unreasonable search of Malone's bedroom, the officers seized an adult videotape and an innocuous photograph of Malone and J.M.

**3. Evidence is Not Clear and Convincing that James Consented to the Search**

Since the evidence is unclear as to who communicated with James and whether that person knew sign language, and since the officers were uncertain as to whether James could read the consent form, we cannot conclude that the State showed by clear and convincing evidence James consented to the search at all. We recognize that James had come with the officers and children from the police station, where he had given a statement through the aid of an interpreter and that, therefore, James was likely well aware of the circumstances. However, this evidence does not rise to the level of clear and convincing when there are factual discrepancies regarding who

communicated with James and the manner in which information was communicated. The signed consent form becomes less convincing as well since the officers testified they were uncertain as to whether James could read. The State failed to meet its burden of showing by clear and convincing evidence that James voluntarily consented to the search.

**4. No Reversible Error In Admission of Items Seized from Common Areas**

The items seized from the common areas of the residence also should have been excluded. However, any error in their admission would also be harmless error in that these items, like those seized from Malone's bedroom, did not contribute to Malone's conviction. TEX.R.APP. P. 44.2(a). The adult videotape is not connected to the allegations of sexual assault and indecency with a child. The seized photograph is innocent in nature and shows a smiling father and daughter. We conclude neither of these illegally obtained items contributed to Malone's convictions.

## III. JURY INSTRUCTION ON LEGALITY OF SEARCH

Malone proposed two different jury instructions to the trial court. These two proposed instructions related to the jury's consideration of evidence in light of the legality of the search. The trial court refused to include either instruction in the charge to the jury. Malone contends the trial court erred by refusing to submit an instruction pursuant to TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005).[8]

**8.** The first proposed instruction instructed the jury that a search is unlawful without the consent of the accused. The second proposed instruction would have instructed the jury that a search is unlawful when the police officer obtains consent to search from the accused by falsely representing to the accused that the officer has a search warrant. Neither

instruction is correct in light of the facts of this case. The State has never contended that Malone consented to the search. Therefore, reference to consent by "the accused" is incorrect. Additionally, the record does not reveal a factual dispute regarding any representation to James that the officers had a search warrant. In sum, the proposed jury

### A. When Article 38.23 Instruction Necessary

In certain instances, the jury may be instructed that it is not to consider illegally obtained evidence. TEX.CODE CRIM. PROC. ANN. art. 38.23(a). A ruling on a motion to suppress may rest on legal rulings or factual findings, or some combination of the two. *Pierce v. State*, 32 S.W.3d 247, 251 (Tex.Crim.App.2000). An instruction pursuant to Article 38.23 is only necessary when there is a dispute regarding the factual basis for the ruling to admit evidence. *Garza v. State*, 126 S.W.3d 79, 85 (Tex.Crim.App.2004); *Pierce*, 32 S.W.3d at 251.

### B. Contested Issues of Fact Regarding James's Consent

Here, the record indicates there was a dispute regarding the factual basis for the trial court's ruling at least with respect to the items seized from the common areas of the residence. Put another way, there is a factual dispute regarding whether James gave knowing and voluntary consent to search. Again, from the record, it is uncertain as to who communicated with James. It is also uncertain as to whether James could read the consent form he signed.

Since there is a factual dispute concerning the voluntariness of James's consent, the trial court was "statutorily bound" to submit an Article 38.23 instruction to the jury. *See Vrba v. State*, 69 S.W.3d 713, 719 (Tex.App.-Waco 2002, no pet.). The trial court erred by refusing to submit to the jury an instruction pursuant to Article 38.23.[9]

### C. No Reversible Error In Failure To Submit Article 38.23 Instruction

The harm standard in Article 36.19 applies to the omission of an Article 38.23 instruction. TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981); *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex.Crim.App. 1996). If the charge error was properly preserved, then we must reverse if the error is "calculated to injure the rights of defendant." *Escobar v. State*, 28 S.W.3d 767, 777 (Tex.App.-Corpus Christi 2000, pet. ref'd). Accordingly, this objected-to error requires reversal if Malone suffered "some harm" from the omission. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1984) (op. on reh'g).

While the trial court erred by refusing to submit to the jury an Article 38.23 instruction, its failure to do so is harmless error. The jury should have been instructed to disregard the evidence if it believes, or has a reasonable doubt, that the evidence was obtained unlawfully. Since, as we have determined, the items, those seized from the living room, which would have been covered by the instruction, did not contribute to Malone's conviction, the failure to instruct the jury that it may disregard those items of evidence is

---

instructions do not put before the jury the issues concerning James's authority to consent or the scope of the search pursuant to James's consent. It was not error to refuse to submit to the jury either of *these* incorrect instructions. *See Stone v. State*, 703 S.W.2d 652, 655 (Tex.Crim.App.1986); *Simmons v. State*, 741 S.W.2d 595, 597 (Tex.App.-Dallas 1987, pet. ref'd).

However, a jury instruction that incorrectly states the law can preserve error. *Stone*, 703 S.W.2d at 653–55. Here, the jury charges, although incorrect, were "sufficient to apprise the trial judge of the potential charge error." *See Francis v. State*, 36 S.W.3d 121, 123 (Tex. Crim.App.2000).

9. The issue regarding the authority to search Malone's bedroom is actually one tied to legal reasoning. There is no factual dispute relevant to whether James had the authority to consent to the search.

harmless error. The trial court's failure to instruct the jury that it may disregard evidence that has no bearing on the offense charged does not constitute "some harm."

## IV. DISPROPORTIONATE AND CONSECUTIVE SENTENCES

With respect to Count I, aggravated sexual assault, the jury recommended that Malone serve thirty-five years in Texas Department of Criminal Justice-Institutional Division (TDCJ–ID) and pay a $10,000.00 fine. With respect to Count II, sexual assault, the jury also recommended that Malone serve thirty-five years in TDCJ–ID and pay a $10,000.00 fine. Finally, the jury recommended a punishment of twenty years and a $10,000.00 fine with respect to Count III, indecency with a child. Consistent with the State's request, the trial court ordered that the sentences run consecutively. Malone complains on appeal that each sentence was disproportionate to the offense and that the trial court's decision to stack the sentences caused the sentences to be excessive. Due to the nature of these complaints, we will treat each one in turn.

### A. Proportionality of Individual Sentences Not Preserved For Review

A defendant must object that a sentence is disproportionate when the sentence is imposed or else he or she loses the right to complain about the proportionality of the sentence on appeal. TEX.R.APP. P. 33.1; *Rodriguez v. State*, 71 S.W.3d 778, 779 (Tex.App.-Texarkana 2002, no pet.).

■■ Here, Malone failed to object to the sentences as disproportionate. In fact, when the trial court read the jury's recommendations and asked if the parties had any questions, Malone stated he did not. Going further, when asked to address the trial court's decision whether to stack the sentences, defense counsel affirmatively waived this complaint:

> Your Honor, I think the jury took careful time and consideration when making the recommendations as to punishment and assessing this man's punishment. You've heard the testimony from the family and to what their wishes were, the age of this defendant, and the range of punishment that he received of 35 years, I believe is appropriate. And I don't think stacking these sentences is appropriate in this case.

Thus, Malone has failed to preserve for our review the issue regarding the proportionality of the individual sentences.

### B. No Abuse of Discretion in Stacking Sentences

#### 1. Trial Court's Discretion

■■ The trial court is given discretion to order sentences to run consecutively or concurrently: "[I]n the discretion of the court, the judgment in the second and subsequent convictions may either be that the sentence ... shall begin when the judgment and the sentence ... in the preceding conviction has ceased to operate, or that the sentence ... shall run concurrently with the other case or cases." TEX.CODE CRIM. PROC. ANN. art. 42.08 (Vernon Supp. 2004–2005). In light of the discretion granted to the trial court by Article 42.08(a), we review a complaint about consecutive sentences for an abuse of that discretion. *See Macri v. State*, 12 S.W.3d 505, 511 (Tex.App.-San Antonio 1999, pet. ref'd).

#### 2. Limitations on Trial Court's Discretion

Section 3.03 of the Texas Penal Code limits the trial court's discretion in stacking sentences: "When the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in

a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced. Except as provided by Subsection (b), the sentences shall run concurrently." [10] The Legislature has defined "criminal episode":

the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property, under the following circumstances:

(1) the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan; or

(2) the offenses are the repeated commission of the same or similar offenses.

TEX. PEN.CODE ANN. § 3.01 (Vernon 2003); see Baker, 107 S.W.3d at 673.

■ So, it would appear that Section 3.03(a) applies to Malone's prosecution and disallows stacking of the sentences imposed here. However, Section 3.03(b) goes on to provide specific instances where the trial court may impose consecutive sentences even though the sentences were imposed for offenses arising out of the same criminal episode and prosecuted in a single proceeding. The pertinent portion of Subsection (b) reads as follows:

(b) If the accused is found guilty of more than one offense arising out of the same criminal episode, the sentences may run concurrently or consecutively if each sentence is for a conviction of:

. . . .

(2) an offense:

(A) under Section 21.11, 22.011, 22.021, 25.02, or 43.25 committed against a victim younger than 17 years of age at the time of the commission of the offense regardless of whether the accused is convicted of violations of the same section more than once or is convicted of violations of more than one section; . . . .

TEX. PEN.CODE ANN. § 3.03(b)(2)(A).

Here, Malone was convicted of three of the listed offenses against J.M., who was younger than seventeen years of age at the time of the offenses: aggravated sexual assault of a child in violation of TEX. PEN. CODE ANN. § 22.021 (Vernon Supp.2004–2005), sexual assault in violation of TEX. PEN.CODE ANN. § 22.011 (Vernon Supp. 2004–2005), and indecency with a child in violation of TEX. PEN.CODE ANN. § 21.11 (Vernon 2003). By the plain language of Section 3.03(b), the trial court acted within its discretion in ordering Malone's sentences to run consecutively. We overrule Malone's contention to the contrary.

## V. CONCLUSION

Having concluded either that Malone's points of error are without merit or that any trial court error was harmless error, we affirm the trial court's judgment.

---

**10.** As used in TEX. PEN.CODE ANN. § 3.03 (Vernon 2003), a "single criminal action" refers to a single trial or plea proceeding; as such, a defendant is prosecuted in a "single criminal action" when allegations and evidence of more than one offense arising out of the same criminal episode are presented in a single trial or plea proceeding. Baker v. State, 107 S.W.3d 671, 673 (Tex.App.-San Antonio 2003, no pet.).