# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00376-CR

---

**Nicholas Gonzales, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
### NO. CR-21-2038-A, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

---

## O P I N I O N

Nicholas Gonzales appeals his continuous-sexual-abuse-of-a-child convictions, arguing the trial court abused its discretion in admitting expert testimony and in failing to ask him if there was anything he wished to say before it imposed sentence. We affirm.

## BACKGROUND

During an "Adam and Eve" talk, J.T. (then age 8), outcried to her Mother that Gonzales (then Mother's fiancé), had shown her videos of "a boy's middle going into a girl's middle" "multiple times" and had put his "finger in her middle." At the time of the outcry, the family had lived at a house in Kyle for around three months; before that they lived in a duplex in San Marcos.

Mother immediately confronted Gonzales, and he admitted that while he was downloading movies on his laptop in front of J.T. and her younger sister, R.T., an advertisement

for pornography popped up. He used it as an example to explain the "birds and the bees" but otherwise denied the conduct. Mother brought J.T. into the room, and J.T. repeated her allegations in front of Gonzales; Gonzales tried to "cut her off" and "kept on denying it." Mother called R.T. (then age 7) into the room and, when questioned, she too said Gonzales had shown her "a video of how babies were made" and "would put his fingers in her middle." R.T. also clenched her fist and moved it up and down and said Gonzales would make her do that to "his middle." Both girls said it happened "back at the old house" in San Marcos. R.T. said it had also happened at the Kyle house, about a week ago, when Mother went to get her nails done for Easter. Gonzales left the house and Mother called the police. At Roxanne's House, a Children's Advocacy Center in San Marcos, forensic interviewer Maggie Ortuno interviewed the girls and forensic sexual assault nurse examiner (SANE) Noella Hill examined the girls; neither girl submitted to a genital exam.

A grand jury indicted Gonzales on two counts of continuous sexual abuse of a child—one alleging abuse of J.T., the other alleging abuse of R.T.

At trial the jury heard from (among others) Mother; J.T. (then 11); R.T. (then 10); Maggie Ortuno; and Noella Hill.

Before Ortuno testified, the trial court held a hearing outside the presence of the jury. She testified about child sexual abuse and investigations, including delayed outcries, types of disclosures by children of abuse, grooming, and coaching. At the end of it, Gonzales objected to her testimony as an expert. Defense counsel stated that Ortuno "had a problem with the scientific method," "hasn't published any articles," and "doesn't know what the potential rate of error" is for the studies she relies on; he also stated her testimony "might be more confusing to the jury than helpful." The trial court overruled the objections, designated Ortuno as an expert witness in child-sexual-abuse investigations and interviews and permitted her to testify.

2

The jury found Gonzales guilty of both counts of continuous sexual abuse and the trial court sentenced him to 25 years' confinement on each count, stacked. Gonzales appeals.

## ANALYSIS

### *Admission of Expert Opinion Testimony as Bolstering*

Gonzales argues that the trial court abused its discretion in permitting an unqualified "expert" to testify about patterns of behavior in victims of alleged child abuse to bolster the girls' testimony.

*Applicable Law and Standard of Review*

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will assist the factfinder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). These conditions are commonly referred to as qualification, reliability, and relevance. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). An appellate court reviews a trial court's ruling on the admission of evidence for an abuse of discretion. *Id*. The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Id*.

*Application*

1. *Qualification—Did the witness qualify as an expert by reason of her knowledge, skill, experience, training, or education?*

"The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works or a combination of these things." *Id*. "Fit" is a component of qualification; the expert's background must be tailored to the specific area of expertise in which the expert desires to testify. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). "Appellate courts may consider several criteria in assessing whether a trial court has abused its discretion in ruling on an expert's qualifications." *Rodgers*, 205 S.W.3d at 528. "First, is the field of expertise complex?" *Id*. "The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify." *Id*. Second, how conclusive is the expert's opinion?" *Id*. "The more conclusive the expert's opinion, the more important is his degree of expertise." *Id*. "And third, how central is the area of expertise to the resolution of the lawsuit?" *Id*. "The more dispositive it is of the disputed issues, the more important the expert's qualifications are." *Id*. Because the possible spectrum of education, skill, and training is so wide, the trial court has great discretion in determining whether a witness possesses sufficient qualification to assist the jury as an expert on a specific topic in a particular case. *Id*. at 527-28.

Ortuno testified on voir dire about her specialized knowledge in child sexual abuse investigations and interviewing, derived from a combination of education, training, and practical experience. *See Rhomer*, 569 S.W.3d at 669. The voir dire record established that Ortuno was a

4

former forensic interviewer at Roxanne's House, and she interviewed the girls in this case. Regarding qualifications, Ortuno testified that she had:

- obtained a bachelor's degree in psychology from Texas State University;

- been certified through the state to conduct forensic interviews of children;

- been trained by the Children's Advocacy Center on "the three-block model" and "multi-session interviewing";

- worked as a forensic interviewer for four and a half years and conducted 843 forensic interviews;

- participated in ongoing training and peer review;

- conducted training on the dynamics of sexual abuse and reporting for new staff at Roxanne's House, law enforcement, Child Protective Services, teachers, and law enforcement; and

- kept up with current trends and research relevant to forensic interviewing.

Second, Ortuno's background went to the very matter on which she was to testify. Her proposed testimony covered general concepts intrinsic to child-sexual-abuse investigations and interviews. *See Vela*, 209 S.W.3d at 131.

Third, Ortuno's field of expertise was not complex but rather a soft science based on experience and training, closer to the jury's common understanding. *See Rodgers*, 205 S.W.3d at 528. And Ortuno's proposed testimony was neither conclusive nor dispositive. *See id.* Ortuno explained that she did not intend to testify that the girls were or were not telling the truth and that she understood that was the jury's role, not hers. Ortuno's testimony was not the only evidence tying Gonzales to the crimes. Rather, by the time the State offered her as an expert witness, Mother had testified about the girls' outcries, both girls had testified about the abuse, and Hill had read

5

aloud the unredacted parts of the statements that she had taken from the girls for purposes of medical diagnosis and treatment.

On this record, the trial court did not abuse its discretion in determining Ortuno possessed sufficient qualifications to assist the jury as an expert on concepts intrinsic to child-sexual-abuse investigations and interviews. *See id*. at 527-28; *Malone v. State*, 163 S.W.3d 785, 794 (Tex. App.—Texarkana 2005, pet. ref'd). We turn to reliability.

*2. Reliability—Was the subject matter of the testimony an appropriate one for expert testimony?*

In determining whether a soft science is an appropriate one for expert testimony we ask "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

First, the subject of child sexual abuse is a legitimate subject within the field of psychology. *Id*.; *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993); *Jessop v. State*, 368 S.W.3d 653, 691 (Tex. App.—Austin 2012, no pet.).

Second, the subject matter of Ortuno's testimony, the common behavioral traits exhibited by child victims (such as delayed outcries) and perpetrators (such as grooming), was within the scope of that field. *See Cohn*, 849 S.W.2d at 819; *Morris v. State*, 361 S.W.3d 649, 669 (Tex. Crim. App. 2011).

Third, Ortuno's testimony properly relied upon and utilized the principles involved in the field. In addition to her testimony outlined above, Ortuno testified about the "semistructured

6

narrative process of forensic interviewing," "developed to minimize suggestibility in children" and "maximize their ability to tell something that they have experienced." She also testified about the interview stages—introduction and rapport-building; developmental assessment of communication; the truth/lie oath; the topic of concern; the detail-gathering portion; focus/recall questions; sensory detail questions; a break; and closure with a safety talk and then a neutral talk. She testified she followed this process in her interviews with J.T. and R.T. We conclude that the trial court did not abuse its discretion in finding the subject matter of Ortuno's testimony appropriate for expert testimony. *See Nenno*, 970 S.W.2d at 561.

We turn to relevance.

### 3. Relevance—Did admitting the expert testimony assist the factfinder in deciding the case?

Under Texas Rule of Evidence 401, evidence is considered relevant if it meets two criteria: (a) it has any tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action. Tex. R. Evid. 401. The Court of Criminal Appeals long ago explained why testimony like Ortuno's is relevant and admissible:

> Child abuse, especially of the sexual kind, is not a new problem to society. We have learned, much to our dismay, the problem is larger than ever thought, largely because child sexual abuse was in the past a hidden crime—a taboo topic of conversation. But it cannot be said that each of us understands all facets of the problem, including why a child who has been abused will act in a certain manner which to the layman may appear unreasonable or inconsistent with a claim of abuse. Brogden's information was both relevant and admissible under the rules of evidence, because it was specialized information of value in assisting the jury to understand the evidence regarding the complainant's conduct.

*Duckett v. State*, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990), *disapproved of on other grounds by Cohn v. State*, 849 S.W.2d 817 (Tex. Crim. App. 1993). So too here, Ortuno's specialized

7

information was of value in assisting the jury to understand the evidence regarding the conduct of the girls and of Gonzales.

Ortuno described delayed outcries ("the child waits a given period of time before they decide to make that disclosure . . . hours, days, weeks, months, years after the fact" maybe because they "don't have the vocabulary to even explain what they're experiencing" or "[f]ear not being believed, fear of being blamed" or because of "threats that are made by the abuser" or "understanding the ramifications for telling"). J.T. testified that she had held back from telling Mother for "about a year" because "[Gonzales] would tell me not to tell her because it would, like, make—mess everything up, because, like, since they were already engaged—they were going to get married." She was "excited to be a flower girl [and] didn't want to mess anything up." R.T., too, was told by Gonzales not to tell anyone. She testified that she had wanted to but "there was so much what-ifs in my head." She was worried that Gonzales would deny it.

Ortuno described purposeful disclosures ("the child making the conscious decision to tell") and accidental disclosures ("when the information comes out without the child having really made the conscious choice to tell themselves"). J.T. outcried to Mother after Mother started talking to her about Adam and Eve and womanhood. J.T. told her that she already knew about that and about where babies come from. Mother testified that she asked J.T. why and that is when J.T. told her about Gonzales's videos and abuse; R.T. too only outcried after being directly questioned by Mother.

Ortuno explained the way children mark time ("we're going to ask . . . contextual details like 'Do you remember what grade you were in when this happened?' rather than, you know, 'Tell me the date this happened'"). Both J.T. and R.T. testified that Gonzales abused them in the San Marcos house (so before the move to Kyle). When J.T. was asked if she and R.T. were

8

ever in the same room, J.T. testified, "Yes. Only once, though. We were at my San Marcos house, right, and it was in the laundry room. And, like, we were sitting on the dryer and washer, and he would do it—he did it to both of us." R.T. testified Gonzales's abuse of her continued in Kyle.

Ortuno explained grooming ("systematic manipulation of a child . . . in order to both gain access to that child, and then slowly start to desensitize that child to sexualized ideas and materials in order to ultimately gain some sort of sexual interaction with that child"). J.T. had testified that Gonzales would show her videos; Gonzales told her the men in the videos were stepdads and in the videos the guys were "having sex with, like, teenagers probably, like, 14-year-olds." R.T. described one animated video that Gonzales showed her, where a teenager went out without permission and then, as punishment, had to "put her mouth on" the "boy's private." She said he introduced her to the videos when she was "in kinder."

Ortuno explained tentative disclosure ("when a child chooses to give a little bit of information over time" to "kind of test the waters and see what happens"). R.T. testified that whenever her mom was out, Gonzales "would either put his hands in my private part or he would put his middle in my private part." R.T. also testified that while her mom was in the shower, he put a "toy" with a sunflower handle on her "private part"; and "whenever you would turn on that toy, "it would vibrate." She had not disclosed this degree of abuse before, and Gonzales emphasized that in cross-examination of witnesses and mentioned it in closing argument as a reason to question R.T.'s credibility.

Ortuno also explained the dynamics between an abuser and his victim ("there are cases where, you know, it's a biological parent or a family member, someone who inherently already has that child's love and respect and trust" and that creates "a big barrier to disclosure").

9

Mother testified that the girls considered Gonzales their stepdad and that is how they referred to him.

Ortuno testified only briefly about her interviews with J.T. and R.T; she did not go into the content of the interviews. When the State asked Ortuno about looking for signs of coaching, Gonzales objected on the ground that the testimony would skirt around the issue of whether Ortuno thought the girls were being truthful. Ortuno clarified before the jury that her role is not to determine whether the child is telling the truth but rather to determine if they had been told what to say. On cross-examination, Gonzales asked Ortuno about false outcries, and Ortuno stated that "there's really no way for me to determine—if a child has made a false outcry or not." Ortuno never, directly or indirectly, gave her opinion as to the credibility of either girl or the class of complainants the girls belong to; nor did she give an opinion on whether the girls had been coached.

The *Duckett* court specifically rejected the notion that the kind of testimony Ortuno gave necessarily improperly bolsters the credibility of child complainants. *Duckett*, 797 S.W.2d at 919–20. And after *Cohn*, the relevance of such evidence is not dependent upon it serving some kind of rehabilitative function; nor does its corroborating effect unfairly prejudice the defendant for purposes of Rule 403. *Cohn*, 849 S.W.2d at 819-20. Once Ortuno imparted her specialized knowledge concerning the behavioral characteristics typically exhibited by sexual-abuse victims and predators, the jurors were appropriately left to draw their own conclusions concerning the credibility of the witnesses. *See Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993). The trial court did not abuse its discretion in determining the testimony was relevant to assist the factfinders. *Cohn*, 849 S.W.2d at 819-20.

10

*4. The trial court did not abuse its discretion in admitting the expert testimony under Rule 702.*

As discussed above, the record supports findings that Ortuno qualified as an expert, that the subject matter of her testimony was an appropriate one for expert testimony, and that the expert testimony assisted the factfinder in deciding the case. *See Rodgers*, 205 S.W.3d at 527; *Rhomer*, 569 S.W.3d 669; *Cohn*, 849 S.W.2d at 820. We overrule Gonzales's first issue.

### Pronouncing Sentence Before Allocution

In his second issue, Gonzales contends the trial court violated his right to due process by denying him the common-law right to allocution before sentencing.

### Applicable Law and Standard of Review

Allocution can refer to a "trial judge's formal address to a convicted defendant, asking whether the defendant wishes to make a statement or to present information in mitigation of the sentence to be imposed" or an "unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in effort to lessen the impending sentence." *Allocution*, Black's Law Dictionary (12th ed. 2024); *see also Green v. United States*, 365 U.S. 301, 304 (1961) ("The design of [the federal rule of allocution] did not begin with its promulgation; its legal provenance was the common-law right of allocution.").

The right to allocution is absolute under Texas statutory law: "Before pronouncing sentence, the defendant shall be asked whether he has anything to say why the sentence should not be pronounced against him." Tex. Code Crim. Proc. art. 42.07. But the Texas statute also provides that the only reasons which can be shown are that the defendant (1) has received a pardon; (2) is incompetent to stand trial; or (3) is not the person who has been convicted. *Id*. The common-law

11

right to allocution contains no such restrictions. *See Norton v. State*, 434 S.W.3d 767, 770–71 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

*Application*

Before pronouncing sentence, Gonzales was not "asked whether he has anything to say why the sentence should not be pronounced against him." Tex. Code Crim. Proc. art. 42.07. And Gonzales does not here contend that he has received a pardon, is incompetent, or is not the person who has been convicted. He acknowledges that he failed to notify the trial court of his desire to exercise his common-law right to allocation before the imposition of sentence, and that appellate courts have held that such a failure waives any complaint on appeal. *See McClintick v. State*, 508 S.W.2d 616, 618 (Tex. Crim. App. 1974) (op. on reh'g) ("It is the appellant's contention that Article 42.07. . . does not replace the common law right of allocution; that is, the opportunity for a defendant to present his personal plea to the Court in mitigation of punishment before sentence is imposed" but "admits that he did not raise this contention before the trial court prior to the imposition of sentence" so "nothing is presented for review.").

Gonzales nevertheless argues that he should not be held to have forfeited any error because the right to allocution should be considered a right "which must be implemented by the system unless expressly waived." In *Marin v. State*, the Court of Criminal Appeals recognized that most rules fall into one of three distinct categories: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request. 851 S.W.2d 275, 279 (Tex. Crim. App. 1993). The Texas law of procedural default applies only to the last category. *Id*. Gonzales is thus arguing that the right to allocution is a Category 2 *Marin* right.

It is unclear whether the common law right to allocution survives article 42.07, much less that the common law right is a Category 2 *Marin* right.  The Texas Code of Criminal Procedure provides that, "If this Code fails to provide a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern."  Tex. Code Crim. Proc. art. 1.27.  Article 1.27 could provide for continued application of the common-law right.  No court has yet said so.  *See Hunter v. State*, 691 S.W.3d 247, 253 & 253 n.2 (Tex. App.—Dallas 2024, no pet.) (expressing no opinion as to whether common-law right of allocution exists in Texas; noting question of whether statute supplanted any potential broader reach of common-law right remains unanswered).

Regardless, we agree with the many courts before us that have, like *McClintick*, held that the failure to assert the common law right to allocation at trial forfeits error.  *Hunter*, 691 S.W.3d at 253; *Vasquez v. State*, 605 S.W.3d 734, 739 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *Norton v. State*, 434 S.W.3d 767, 771 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Jarvis v. State*, 353 S.W.3d 253, 254 (Tex. App.—Fort Worth 2011, pet. ref'd); *Eisen v. State*, 40 S.W.3d 628, 637 (Tex. App.—Waco 2001, pet. ref'd).  As the State notes, the Texas law of procedural default applies even where the trial court wholly fails to ask the defendant if he or she has anything to say.  *See Hernandez v. State*, 628 S.W.2d 145, 147 (Tex. App.—Beaumont 1982, no pet.); *Eisen*, 40 S.W.3d at 632, 635-37.  We conclude that Gonzales failed to preserve error in the trial court regarding this issue and therefore overrule it.

**CONCLUSION**

Having overruled Gonzales's two issues, we affirm the judgments of the trial court.

13

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   September 11, 2025

Publish