COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

       NOS.  2-06-009-CR 

2-06-010-CR

2-06-011-CR

2-06-012-CR 

2-06-013-CR

 

BARON DEWYON BOSTICE                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 396TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

                                                    

MEMORANDUM
OPINION[1]

 

Appellant Baron Dewyon
Bostice appeals four convictions for aggravated robbery with a deadly weapon
and one conviction for burglary of a habitation.  In his sole point, appellant complains that
the trial court erred by denying his oral motion to suppress evidence.  We affirm.








On October 11 and 19, 2004, a
series of aggravated robberies and a burglary were committed by two masked men
in the neighboring northeast Tarrant County communities of Colleyville, Keller,
and Southlake.  Appellant was arrested on
November 11 on suspicion of burglarizing a motor vehicle in another Tarrant
County community, Dalworthington Gardens. 
Evidence gathered after his arrest connected him to the five nearby home
invasions of October 11 and 19.[2]  Prior to his trial for those offenses,
appellant moved to suppress the evidence.








Officer Therman Campbell was
the first of three witnesses to testify for the State at the hearing on the
oral motion to suppress.  He testified
that on the night of November 10, 2004, at approximately 11:40 p.m., he was
dispatched to a residential location in Dalworthington Gardens in connection
with a suspicious person and vehicle call. 
Karel Boore, a resident of the neighborhood, had reported that two black
men dressed in black had parked and exited a green Mitsubishi Eclipse, walked
down the street, looked at cars parked in driveways, and hid themselves in the
shadows of one of the residences in the neighborhood.  Boore told Officer Campbell that she had
never before seen the Eclipse in the neighborhood.  Officer Campbell also noticed that the
Eclipse was parked on the street rather than in a driveway or garage, which was
not typical for the neighborhood; the Eclipse was older than other cars in the
area; and the Eclipse had a paper buyer=s tag for a license plate with the name Baron D. Bostice on it.   

Based on the suspicions
raised by these circumstances, Officer Campbell parked about three houses east
of the Eclipse for observation.  At
approximately 12:40 a.m., he received a call from police dispatch informing him
that Boore had called again and reported seeing two people further down the
same street, moving into the driveway of another residence.  When Officer Campbell went to check on that
residence, he was told that an iPod had been stolen from one of the resident=s vehicles. 








Officer Campbell then
returned to the Eclipse and searched it for evidence relating to the burglary
of the motor vehicle and theft of the iPod. 
In the course of the search, he did not find any burglar tools or stolen
items; however, inside the closed center console he discovered appellant=s wallet.  Officer Campbell
removed appellant=s driver=s license from the wallet, ran the license for warrants and a
background check, and learned that appellant had a criminal history for
burglary.  After searching the Eclipse,
Officer Campbell continued his surveillance and radioed other officers to Alet everyone know what was going on@ and to ask for assistance in securing a perimeter around the area. 

Officer Brent Wright learned
of the night=s events by
radio and arrived on the scene around 2:30 a.m., parking approximately one
quarter mile from Officer Campbell. 
Shortly after Officer Wright set up at his location, two black men, whom
he identified at trial as appellant and Joseph Nelson, approached him in
another vehicle and asked if he had seen a green Mitsubishi Eclipse.  Officer Wright asked the two men to pull over
to the side of the road and called for backup. 








Officer Jerry Vennum
testified that as he was driving to the scene around 2:30 a.m., radio dispatch
informed him that two black male suspects had approached Officer Wright to ask
for directions and that Officer Wright had detained them.  When Officer Vennum arrived, he proceeded to
read appellant and Nelson their rights and asked them why they were looking for
the Eclipse.  Appellant told him they were
looking for appellant=s car
because his girlfriend had left the car Asomewhere in Dalworth.@  Officer Vennum found this
suspicious because Dalworth is in the city of Grand Prairie and because
Boore had reported seeing two males get out of the car.  At some point during this detention, Officer
Campbell arrived and Alet[]
everybody else know what . . . had gone on.@  Officer Vennum ultimately
arrested appellant for burglary of a motor vehicle.[3]


Officer Vennum testified that
he based his decision to arrest appellant on the information he had received
from the other officers, radio dispatch, and his conversation with
appellant.  Additionally, he stated that
he considered the totality of the circumstances including the fact that
appellant fit the description of the persons Boore said she had seen parking the
Eclipse and walking in between houses late at night; appellant=s name was on the dealer=s tag of the Eclipse; appellant=s driver=s license
was found in the vehicle; appellant arrived looking for the Eclipse; Officer
Vennum disbelieved appellant=s explanation of why he was in the area; and appellant had a criminal
history for burglary.  Officer Vennum
conceded that appellant was not wearing dark clothing as Boore had reported of
the suspects but explained that enough time had elapsed that the burglars could
have changed clothes.  He also admitted
Boore=s description of the two individuals she had seen was somewhat vague. 

The trial court denied
appellant=s oral
motion to suppress, finding probable cause for the arrest of appellant and
ruling that the evidence seized from the inventories of appellant=s wallet and car was admissible. 









Appellant first argues that
the search of his car was not justified under the automobile exception to
warrantless searches because Officer Campbell did not have probable cause to
search the vehicle and, even if probable cause existed, searching his wallet
exceeded the scope of the probable cause.  
At the hearing on the oral motion to suppress, however, appellant merely
challenged his arrest and the seizure of property in connection with the
arrest.[4]  Because appellant did not complain about
Officer Campbell=s pre-arrest
warrantless search of appellant=s car and wallet in the trial court, the issue is waived.[5]








Appellant complains further
that his warrantless arrest for burglary of a motor vehicle was improper under
chapter 14 of the Texas Code of Criminal Procedure and under the Fourth
Amendment.  Appellant=s argument that his arrest violated chapter 14 of the code of criminal
procedure is not preserved for our review because appellant did not raise this
complaint in the trial court.[6]  We will, therefore, only address appellant=s complaint that his arrest violated the Fourth Amendment.

A warrantless arrest is unreasonable
per se under the Fourth Amendment unless it fits into one of a few specifically
established and well-delineated exceptions.[7]  To justify a warrantless, public arrest over
constitutional objections, the arresting officer must have probable cause,
defined as a reasonable belief that, based on specific and articulable facts
and circumstances within the officer=s personal knowledge, or of which the officer has reasonably
trustworthy information, an offense has been committed.[8]   








Probable cause requires more
than mere suspicion but much less evidence than that needed to support a
conviction.[9]  An unarticulated hunch, suspicion, or even
the good faith of the arresting officer is insufficient to support probable
cause to justify a warrantless arrest.[10]  Further, there is a significant difference
between probable cause to believe that someone has committed an offense and
probable cause to believe that a particular person has committed an offense,
and probable cause to arrest must Apoint like a beacon toward the specific person being arrested.@[11]  Where, as here, officers
participating in an investigation have shared information, this Acollaborative exchange of information@ must be considered in determining whether there is probable cause.[12]  When events are as consistent with innocent
activity as with criminal activity, the detention of a suspect based on these
events is unlawful.[13]









We defer to the trial court=s findings of historical fact, but we review de novo questions
involving legal principles and the application of law to established facts.[14]  Because the facts relevant to the motion to
suppress are not disputed in this case, we review the determination of probable
cause to make a warrantless arrest de novo, viewing the evidence in the light
most favorable to the trial court=s ruling and examining the totality of the circumstances.[15]

In this case, the
investigating officers knew the following at the time Officer Vennum arrested
appellant:

$      
a resident had reported seeing two black males
dressed in dark clothing walking near residences and hiding in the shadows; 

 

$      
the two individuals arrived
in a green Eclipse; 

$      
the Eclipse seemed out of place in the upscale
neighborhood because of its age and where it was parked;  

 

$      
another resident reported a vehicle burglary
involving an iPod;

 

$      
appellant=s name was on the license
plate of the Eclipse, and Officer Campbell found his driver=s
license inside;   

 

$      
appellant and Nelson, two black males, arrived on
the scene looking for the Eclipse;

 

$      
appellant=s explanation of why he was
in the area was suspicious because it was geographically inaccurate and
conflicted with Boore=s
report; and 

 

$      
appellant had a criminal
history of burglary.[16]









Viewing the
totality of the circumstances in the light most favorable to the trial court=s ruling, we do not believe the evidence supports a finding of
probable cause to arrest appellant without a warrant for burglary of the motor
vehicle.  Although Officer Vennum may
have had reasonable suspicion to detain and question appellant based on the information
available to him at the time, none of this information pointed Alike a beacon@ to
appellant=s
involvement in the burglary of the motor vehicle and theft of the iPod.[17]  Instead, appellant=s appearance and actions in the neighborhood were as consistent with
innocent activity as with possible criminal activity.[18]  At best, the record supports nothing more
than a suspicion or a hunch on the part of the officers that appellant had
committed the vehicle burglary.  Gut
feelings, however, are insufficient to support probable cause to arrest.[19]









Because
appellant=s arrest was
not supported by probable cause, the trial court erred by denying appellant=s motion to suppress and by admitting the Aimmediate fruits@ of the
arrestCthe gift cards, cell phone, and cell phone billC into evidence at trial.[20]  Having determined that the trial court erred,
we must now turn to the question of whether appellant was harmed by the error.  








When
evidence obtained in violation of the Fourth Amendment is improperly admitted
at trial, the appropriate harm analysis is rule 44.2(a)=s constitutional standard.[21]  The question is whether the trial court=s error was harmless beyond a reasonable doubt.[22]  In applying the Aharmless error@ test, our
primary question is whether there is a Areasonable possibility@ that the error might have contributed to the conviction.[23]  Our analysis should not focus on the
propriety of the outcome of the trial; instead, we should calculate as much as
possible the probable impact on the jury in light of the existence of other
evidence.[24]  We consider the source and nature of the
error, the extent that it was emphasized by the State, its probable collateral
implications, the weight a juror would probably place on the error, and whether
declaring it harmless would be likely to encourage the State to repeat it with
impunity.[25]  This requires us to evaluate the entire
record in a neutral, impartial, and even-handed manner, not Ain the light most favorable to the prosecution.@[26] 

The
unchallenged evidence admitted at appellant=s trial includes the following:

Three witnesses testified to incriminating statements that appellant
made to them about his involvement in the offenses for which he was
convicted.  Stephanie Loecher, one of
appellant=s friends,
testified as follows: 








$      
Appellant said that A[he
and Nelson] had kicked the shB out of the dog,@ a
detail that matched two victims= account of the first home
invasion of October 11, 2004. 

 

$      
Appellant said that he Awent
to the ATM machine, but he told [Nelson] that he didn=t
want to go in >that
car=
[referring to a gray Taurus].@  This matched evidence of the theft of an one
victim=s
debit card, PIN, and the withdrawal from her account by individuals in a gray
car.[27]


 

$      
Appellant stated, A[Nelson]
put gas in the car . . . [that] was used to do the home invasion,@
again referring to the gray Taurus.

 

$      
She heard appellant bragging that Athere
was a lady watering her grass and he had to . . . hit her with a gun,@ a
detail that matched an extraneous offense that occurred shortly after the third
home invasion of October 11. 

 

$      
Appellant stated that he Ahad
to put them girls in the trunk of the car.@  This detail matched testimony by two teenage
victims of one of the home invasions of October 19. 

 

$      
She saw appellant cleaning rings that Ahe
said he [had gotten] from the home invasion and they were worth a lot of money.@  Several rings had been stolen in the home
invasions, including one worth over $10,000. 

 

$      
Appellant asked her boyfriend, Travis Sterling,
to Acome
ride with [appellant] and be a lookout for something,@ one
day before the October 19 home invasions.          

 








$      
Nelson told her that he and appellant were
scoping another house in Dalworthington Gardens the night that appellant was
arrested and that appellant had given the police a false story to explain their
appearance at the scene. 

 

Santonja Thomas, who was also friends with appellant, Loecher, and
Nelson, testified to the following:      

$      
Sterling had tried to sell her a silver Sprint
flip cell phone with a Mavericks screensaver, and appellant asked Awhy
would [Sterling] even try to sell that phone anyway when [he] already knew
where it came from.@  The phone had been stolen from one of the
teenage victims of an October 19 home invasion. 

 

$      
Appellant said he did not Awaste
his time messing with that kind of stuff [cell phones] . . . [but] he just get
what he going to get and then get the hell out. [sic]@ 

 

$      
Appellant asked Loecher if she would let him
borrow a black pair of pants.  Victims=
testimony revealed the robbers always wore black or dark colored clothing. 

 

Glenn Watts, appellant=s former cellmate, testified as follows:   

$      
He heard appellant admit that he and Nelson had Aburglarized
some homes.@

 

$      
Appellant bragged that he had held guns to people=s
heads and held them on the floor; taken jewelry off of the victims, women
especially; and had taken a very valuable ring and other items.  These details matched testimony of many of
the victims. 

 

$      
Appellant said he Atargeted
influential neighborhoods, high class.@  The jury was shown photos of each house that
was robbed, and they all appeared to be large houses. 

 








In addition to this testimony, the State matched appellant=s DNA to a homemade ski mask that two victims identified as that worn
by one of the robbers and to two cigarette butts found in an abandoned gray
Taurus that was discovered near one of the October 19 home invasions.  Several items that had been stolen on October
11 and 19, including two purses, a cell phone, a handmade ceramic coin jar, and
a distinctive prayer card, were found inside the Taurus.  Furthermore, a gun that three victims
identified as being of the type used in the home invasions was found with
papers bearing appellant=s name.  And, in closing argument, the State
emphasized the DNA evidence and admissions more than it emphasized the tainted
evidence.[28]









Having evaluated the entire record in a neutral, impartial, and
even-handed manner, we hold that there is no reasonable possibility that the
trial court=s error in
admitting the tainted gift cards, cell phone, and cell phone bill contributed
to appellant=s
conviction.  At most, this evidence was
cumulative of and no more incriminating than the other evidence presented
against appellant.[29]  The jury was entitled to give substantial
weight to the DNA  evidence and the
admissions, and that evidence alone could easily support appellant=s conviction.  Further, the
officers= conduct in this case, while illegal, does not rise to the level of
flagrant, purposeful misconduct censured by the United States Supreme Court, and
we have no reason to believe that declaring this error harmless will likely
encourage the State to repeat it with impunity.[30]       After
carefully reviewing the record and performing the required harm analysis under
rule 44.2(a), we hold beyond a reasonable doubt that the trial court=s error did not contribute to appellant=s conviction or punishment.[31]  Accordingly, we affirm the trial court=s judgment.

PER CURIAM

PANEL A:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DO NOT PUBLISH        

Tex.
R. App. P. 47.2(b)

DELIVERED:  September 20, 2007











[1]See Tex. R. App. P. 47.4.





[2]The
evidence obtained in connection with appellant=s
arrest included gift cards, a cell phone, and a cell phone bill.  Several of the gift cards had been stolen in
one of the aggravated robberies, and appellant=s
cell phone had been used to make balance inquiries on them.  





[3]Nelson
was detained for questioning but later released. 





[4]At
the beginning of the hearing on the motion to suppress, the parties agreed the
parameters of the motion were Athe arrest of [appellant] for
burglary of a motor vehicle and the property which was collected from that
arrest; that being driver=s
license, credit cards, cell phone, and phone bill, those items in his
possession.@ 





[5]Tex. R. App. P. 33.1; see Mendez v. State,
138 S.W.3d 334, 341B42
(Tex. Crim. App. 2004). 





[6]See
Buchanan v. State, 207 S.W.3d 772, 776B78
(Tex. Crim. App. 2006).  Appellant=s
trial attorney stated, AWe
are asking the Court to test their testimony whether or not the Court feels
like probable cause existed for the arrest of my client by the Dalworthington
Police Department.@ 





[7]Minnesota
v. Dickerson, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135
(1993); Torres v. State, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005).





[8]Buchanan, 207
S.W.3d at 775; Torres, 182 S.W.3d at 902. 





[9]Woodward
v. State, 668 S.W.2d 337, 345 (Tex. Crim. App. 1982) (op.
on reh=g). 





[10]Torres, 182
S.W.3d at 902.





[11]Parker
v. State, 206 S.W.3d 593, 596B97
(Tex. Crim. App. 2006); State v. Richardson, No. 02-06-00033-CR, 2007 WL
495198, at *4 (Tex. App.CFort
Worth Feb. 15, 2007, pet. ref=d) (mem. op., not designated
for publication).





[12]See Wiede
v. State, 214 S.W.3d 17, 27B28 (Tex. Crim. App. 2007); Torres,
182 S.W.3d at 902; Woodward, 668 S.W.2d at 344 (holding that when there
has been cooperation between law enforcement officers, the sum of the
information known to the cooperating officers at the time of an arrest by any
of the officers involved is to be considered in determining whether there was
probable cause).





[13]Hoag
v. State, 728 S.W.2d 375, 379 (Tex. Crim. App. 1987).





[14]Wiede, 214
S.W.3d at 24B25; Kothe
v. State, 152 S.W.3d 54, 62B63 (Tex. Crim. App. 2004).





[15]Weide, 214
S.W.3d at 25; Torres, 182 S.W.3d at 902; Guzman v. State, 955
S.W.2d 85, 87B88
(Tex. Crim. App. 1997).





[16]Importantly,
there is no evidence that the Dalworthington Gardens officers suspected
appellant of the October 2004 aggravated robberies and burglary or were even
aware of those offenses at the time of appellant=s
arrest.





[17]See
Parker, 206 S.W.3d at 596B97.





[18]See
Hoag, 728 S.W.2d at 378B80 (holding no probable cause
to arrest suspect who had criminal history for burglary and who was observed
walking suspiciously around houses and into two apartment complexes).





[19]Torres, 182
S.W.3d at 902.





[20]E.g.,
Wong Sun v. United States, 371 U.S. 471, 484B85,
83 S. Ct. 407, 416 (1963) (holding that both direct and indirect products of
unlawful searches generally must be excluded); Bell v. State, 724 S.W.2d
780, 787B91
(Tex. Crim. App. 1986) (applying attenuation of the taint analysis and
concluding that the Aimmediate
fruits@ of
the illegal arrest should have been suppressed), cert. denied, 479 U.S.
1046 (1987); Boyle v. State, 820 S.W.2d 122, 133 (Tex. Crim. App. 1989)
(noting that where search Aflow[ed] directly@ from
appellant=s
illegal arrest, the evidence was not so attenuated as to be admissible), cert.
denied, 503 U.S. 921 (1992), overruled on other grounds by Gordon v.
State, 801 S.W.2d 899 (Tex. Crim. App. 1990).  Appellant argues that the DNA obtained while
he was in custody in Dalworthington Gardens was also fruit of the illegal
arrest.  He did not, however, seek to
exclude the DNA during the suppression hearing and did not object when it was
later introduced at trial.  Therefore,
appellant has waived any complaint that the DNA should have been suppressed and
not admitted at trial.  See Tex. R. App. P. 33.1; see also
Mendez, 138 S.W.3d at 342 (holding A[e]xcept for complaints
involving systemic (or absolute) requirements, or rights that are waivable only
. . . all other complaints, whether constitutional, statutory, or otherwise,
are forfeited by failure to comply with Rule 33.1(a)@).





[21]Castro
v. State, 202 S.W.3d 348, 359 (Tex. App.CFort
Worth 2006), rev=d on other grounds, 227
S.W.3d 737 (Tex. Crim. App. 2007). 





[22]See
Williams v. State, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). 





[23]Mosley, 983
S.W.2d at 259. 





[24]Wesbrook
v. State, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), cert.
denied, 532 U.S. 944 (2001).  





[25]Harris
v. State, 790 S.W.2d 568, 587 (Tex. Crim. App.
1989).  





[26]Id. at
586. 





[27]This
offense was one of two October 11, 2004 extraneous offenses admitted at trial
due to the similarity of the offenses and their close proximity in time and
distance to the first three home invasions. 





[28]See
Malone v. State, 163 S.W.3d 785, 800 (Tex. App.CTexarkana
2005, pet. ref=d)
(holding error harmless beyond a reasonable doubt, considering the substantial
evidence supporting the jury=s verdict, the nature of the
items unlawfully seized, and the little emphasis placed on the evidence at
issue); Strong v. State, 138 S.W.3d 546, 555 (Tex. App.CCorpus
Christi 2004, no pet.) (holding error admitting evidence was harmless where
evidence was not especially probative, not emphasized, and the State relied on
other evidence in meeting its burden). 





[29]See Long
v. State, 203 S.W.3d 352, 352 (Tex. Crim. App. 2006); Jones v. State,
119 S.W.3d 766, 777 (Tex. Crim. App. 2003); Castro, 202 S.W.3d at 359.





[30]See
Brown v. Illinois, 422 U.S. 590, 605, 95 S. Ct. 2254, 2262 (1975).





[31]Tex. R. App. P. 44.2(a).