COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

    
   NOS.  2-06-009-CR 

2-06-010-CR

2-06-011-CR

2-06-012-CR 

2-06-013-CR

BARON DEWYON BOSTICE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)
 

Appellant Baron Dewyon Bostice appeals four convictions for aggravated robbery with a deadly weapon and one conviction for burglary of a habitation.  In his sole point, appellant complains that the trial court erred by denying his oral motion to suppress evidence.  We affirm.

On October 11 and 19, 2004, a series of aggravated robberies and a burglary were committed by two masked men in the neighboring northeast Tarrant County communities of Colleyville, Keller, and Southlake.  Appellant was arrested on November 11 on suspicion of burglarizing a motor vehicle in another
 Tarrant County community, Dalworthington Gardens.  Evidence gathered after his arrest connected him to the five nearby home invasions of October 11 and 19.
(footnote: 2)  Prior to his trial for those offenses, appellant moved to suppress the evidence.

Officer Therman Campbell was the first of three witnesses to testify for the State at the hearing on the oral motion to suppress.  He testified that on the night of November 10, 2004, at approximately 11:40 p.m., he was dispatched to a residential location in Dalworthington Gardens in connection with a suspicious person and vehicle call.  Karel Boore, a resident of the neighborhood, had reported that two black men dressed in black had parked and exited a green Mitsubishi Eclipse, walked down the street, looked at cars parked in driveways, and hid themselves in the shadows of one of the residences in the neighborhood.  Boore told Officer Campbell that she had never before seen the Eclipse in the neighborhood.  Officer Campbell also noticed that the Eclipse 
was parked on the street rather than in a driveway or garage, which was not typical for the neighborhood; the Eclipse was older than other cars in the area; and the Eclipse had a paper buyer’s tag for a license plate with the name Baron D. Bostice on it. 

Based on the suspicions raised by these circumstances, Officer Campbell parked about three houses east of the Eclipse for observation.  At approximately 12:40 a.m., he received a call from police dispatch informing him that Boore had called again and reported seeing two people further down the same street
, moving into the driveway of another residence.  When Officer Campbell went to check on that residence, he was told that an iPod had been stolen from one of the resident’s vehicles. 

Officer Campbell then returned to the Eclipse and searched it for evidence relating to the burglary of the motor vehicle and theft of the iPod.  In the course of the search, he did not find any burglar tools or stolen items; however, inside the closed center console he discovered appellant’s wallet.  Officer Campbell removed appellant’s driver’s license from the wallet, ran the license for warrants and a background check, and learned that appellant had a criminal history for burglary.  After searching the Eclipse, Officer Campbell continued his surveillance and radioed other officers to “let everyone know what was going on” and to ask for assistance in securing a perimeter around the area. 

Officer Brent Wright learned of the night’s events by radio and arrived on the scene around 2:30 a.m., parking approximately one quarter mile from Officer Campbell.  Shortly after Officer Wright set up at his location, two black men, whom he identified at trial as appellant and Joseph Nelson, approached him in another vehicle and asked if he had seen a green Mitsubishi Eclipse.  Officer Wright asked the two men
 to pull over to the side of the road and called for backup. 

Officer Jerry Vennum testified that as he was driving to the scene around 2:30 a.m., radio dispatch informed him that two black male suspects had approached Officer Wright to ask for directions and that Officer Wright had detained them.  When Officer Vennum arrived, he proceeded to read appellant and Nelson their rights and asked them why they were looking for the Eclipse.  Appellant told him they were 
looking for appellant’s car because his girlfriend had left the car “somewhere in Dalworth.”  Officer Vennum found this suspicious because Dalworth is in the city of Grand Prairie
 
and because Boore had reported seeing two males get out of the car.  At some point during this detention, Officer Campbell arrived and “let[] everybody else know what . . . had gone on.”  Officer Vennum ultimately arrested appellant for burglary of a motor vehicle.
(footnote: 3) 

Officer Vennum testified that he based his decision to arrest appellant on the information he had received from the other officers, radio dispatch, and his conversation with appellant.  Additionally, he stated that he considered the totality of the circumstances including the fact that appellant fit the description of the persons Boore said she had seen parking the Eclipse and walking in between houses late at night; appellant’s name was on the dealer’s tag of the Eclipse; appellant’s driver’s license was found in the vehicle; appellant arrived looking for the Eclipse; Officer Vennum disbelieved appellant’s explanation of why he was in the area; and appellant had a criminal history for burglary.  Officer Vennum conceded that appellant was not wearing dark clothing as Boore had reported of the suspects but explained that enough time had elapsed that the burglars could have changed clothes.  He also admitted Boore’s description of the two individuals she had seen was somewhat vague. 

The trial court denied appellant’s oral motion to suppress, finding probable cause for the arrest of appellant and ruling that the evidence seized from the inventories of appellant’s wallet and car was admissible.  

Appellant first argues that the search of his car was not justified under the automobile exception to warrantless searches because Officer Campbell did not have probable cause to search the vehicle and, even if probable cause existed, searching his wallet exceeded the scope of the probable cause.  
 At the hearing on the oral motion to suppress, however, appellant merely challenged his arrest and the seizure of property in connection with the arrest.
(footnote: 4)  Because appellant did not complain about Officer Campbell’s pre-arrest warrantless search of appellant’s car and wallet in the trial court, the issue is waived.
(footnote: 5)
 Appellant complains further that his warrantless arrest for burglary of a motor vehicle was improper under chapter 14 of the Texas Code of Criminal Procedure and under the Fourth Amendment.  Appellant’s argument that his arrest violated chapter 14 of the code of criminal procedure is not preserved for our review because appellant did not raise this complaint in the trial court.
(footnote: 6) 
 
We will, therefore, only address appellant’s complaint that his arrest violated the Fourth Amendment.

A warrantless arrest is unreasonable per se under the Fourth Amendment unless it fits into one of a few specifically established and well-delineated exceptions.
(footnote: 7)  To justify a warrantless, public arrest over constitutional objections, the arresting officer must have probable cause, defined as a reasonable belief that, based on specific and articulable facts and circumstances within the officer’s personal knowledge, or of which the officer has reasonably trustworthy information, an offense has been committed.
(footnote: 8)   

Probable cause requires more than mere suspicion but much less evidence than that needed to support a conviction.
(footnote: 9)  An unarticulated hunch, suspicion, or even the good faith of the arresting officer is insufficient to support probable cause to justify a warrantless arrest.
(footnote: 10)  Further, there is a significant difference between probable cause to believe that someone has committed an offense and probable cause to believe that a particular person has committed an offense, and probable cause to arrest must “point like a beacon toward the specific person being arrested.”
(footnote: 11)  Where, as here, officers participating in an investigation have shared information, this “collaborative exchange of information” must be considered in determining whether there is probable cause.
(footnote: 12)  When events are as consistent with innocent activity as with criminal activity, the detention of a suspect based on these events is unlawful.
(footnote: 13) 

We defer to the trial court’s findings of historical fact, but we review de novo questions involving legal principles and the application of law to established facts.
(footnote: 14)  Because the facts relevant to the motion to suppress are not disputed in this case, we review the determination of probable cause to make a warrantless arrest de novo, viewing the evidence in the light most favorable to the trial court’s ruling and examining the totality of the circumstances.
(footnote: 15)
 In this case, the investigating officers knew the following at the time Officer Vennum arrested appellant:

a resident had reported seeing two black males dressed in dark clothing walking near residences and hiding in the shadows; 

the two individuals arrived in a green Eclipse; 

the Eclipse seemed out of place in the upscale neighborhood because of its age and where it was parked;  

another resident reported a vehicle burglary involving an iPod;

appellant’s name was on the license plate of the Eclipse, and Officer Campbell found his driver’s license inside; 

appellant and Nelson, two black males, arrived on the scene looking for the Eclipse;

appellant’s explanation of why he was in the area was suspicious because it was geographically inaccurate and conflicted with Boore’s report; and 

appellant had a criminal history of burglary.
(footnote: 16) 

Viewing the totality of the circumstances in the light most favorable to the trial court’s ruling, we do not believe the evidence supports a finding of probable cause to arrest appellant without a warrant for burglary of the motor vehicle.  Although Officer Vennum may have had reasonable suspicion to detain and question appellant based on the information available to him at the time, none of this information pointed “like a beacon” to appellant’s involvement in the burglary of the motor vehicle and theft of the iPod.
(footnote: 17)  Instead, appellant’s appearance and actions in the neighborhood were as consistent with innocent activity as with possible criminal activity.
(footnote: 18)  At best, the record supports nothing more than a suspicion or a hunch on the part of the officers that appellant had committed the vehicle burglary.  Gut feelings, however, are insufficient to support probable cause to arrest.
(footnote: 19) 

Because appellant’s arrest was not supported by probable cause, the trial court erred by denying appellant’s motion to suppress and by admitting the “immediate fruits” of the arrest—the gift cards, cell phone, and cell phone bill— into evidence at trial.
(footnote: 20)  Having determined that the trial court erred, we must now turn to the question of whether appellant was harmed by the error.  

When evidence obtained in violation of the Fourth Amendment is improperly admitted at trial, the appropriate harm analysis is rule 44.2(a)’s constitutional standard.
(footnote: 21)  The question is whether the trial court’s error was harmless beyond a reasonable doubt.
(footnote: 22)  
In applying the “harmless error” test, our primary question is whether there is a “reasonable possibility” that the error might have contributed to the conviction.
(footnote: 23) 
 
Our analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence.
(footnote: 24)  
We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity.
(footnote: 25)  
This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not “in the light most favorable to the prosecution.”
(footnote: 26) 

The unchallenged evidence admitted at appellant’s trial includes the following:

Three witnesses testified to incriminating statements that appellant made to them about his involvement in the offenses for which he was convicted.  Stephanie Loecher, one of appellant’s friends, testified as follows: 

Appellant said that “[he and Nelson] had kicked the sh– out of the dog,” a detail that matched two victims’ account of the first home invasion of October 11, 2004. 

Appellant said that he “went to the ATM machine, but he told [Nelson] that he didn’t want to go in ‘that car’ [referring to a gray Taurus].”  This matched evidence of the theft of an one victim’s debit card, PIN, and the withdrawal from her account by individuals in a gray car.
(footnote: 27) 

Appellant stated, “[Nelson] put gas in the car . . . [that] was used to do the home invasion,” again referring to the gray Taurus.

She heard appellant bragging that “there was a lady watering her grass and he had to . . . hit her with a gun,” a detail that matched an extraneous offense that occurred shortly after the third home invasion of October 11. 

Appellant stated that he “had to put them girls in the trunk of the car.”  This detail matched testimony by two teenage victims of one of the home invasions of October 19. 

She saw appellant cleaning rings that “he said he [had gotten] from the home invasion and they were worth a lot of money.”  Several rings had been stolen in the home invasions, including one worth over $10,000. 

 

Appellant asked her boyfriend, Travis Sterling, to “come ride with [appellant] and be a lookout for something,” one day before the October 19 home invasions. 

Nelson told her that he and appellant were scoping another house in Dalworthington Gardens the night that appellant was arrested and that appellant had given the police a false story to explain their appearance at the scene. 

Santonja Thomas, who was also friends with appellant, Loecher, and Nelson, testified to the following: 

Sterling had tried to sell her a silver Sprint flip cell phone with a Mavericks screensaver, and appellant asked “why would [Sterling] even try to sell that phone anyway when [he] already knew where it came from.”  The phone had been stolen from one of the teenage victims of an October 19 home invasion. 

Appellant said he did not “waste his time messing with that kind of stuff [cell phones] . . . [but] he just get what he going to get and then get the hell out. [sic]” 

Appellant asked Loecher if she would let him borrow a black pair of pants.  Victims’ testimony revealed the robbers always wore black or dark colored clothing. 

Glenn Watts, appellant’s former cellmate, testified as follows: 

He heard appellant admit that he and Nelson had “burglarized some homes.”

Appellant bragged that he had held guns to people’s heads and held them on the floor; taken jewelry off of the victims, women especially; and had taken a very valuable ring and other items.  These details matched testimony of many of the victims. 

Appellant said he “targeted influential neighborhoods, high class.”  The jury was shown photos of each house that was robbed, and they all appeared to be large houses. 

In addition to this testimony, the State matched appellant’s DNA to a homemade ski mask that two victims identified as that worn by one of the robbers
 and to two cigarette butts found in an abandoned gray Taurus that was discovered near one of the October 19 home invasions.  Several items that had been stolen on October 11 and 19, including two purses, a cell phone, a handmade ceramic coin jar, and a distinctive prayer card, were found inside the Taurus.  Furthermore, a gun that three victims identified as being of the type used in the home invasions was found with papers bearing appellant’s name.  And, i
n closing argument, the State emphasized the DNA evidence and admissions more than it emphasized the tainted evidence.
(footnote: 28) 

Having evaluated the entire record in a neutral, impartial, and even-handed manner, we hold that there is no reasonable possibility that the trial court’s error in admitting the tainted gift cards, cell phone, and cell phone bill contributed to appellant’s conviction.  At most, this evidence was cumulative of and no more incriminating than the other evidence presented against appellant.
(footnote: 29)  The jury was entitled to give substantial weight to the DNA  evidence and the admissions, and that evidence alone could easily support appellant’s conviction.  
Further, the officers’ conduct in this case, while illegal, 
does not rise to the level of flagrant, purposeful misconduct censured by the United States Supreme Court,
 and we have no reason to believe that declaring this error harmless will likely encourage the State to repeat it with impunity.
(footnote: 30) 
After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court’s error did not contribute to appellant’s conviction or punishment.
(footnote: 31) 
 Accordingly, we affirm the trial court’s judgment.

PER CURIAM

PANEL A:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DO NOT PUBLISH 

Tex. R. App. P.
 47.2(b)

DELIVERED:  September 20, 2007 

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
The evidence obtained in connection with appellant’s arrest included gift cards, a cell phone, and a cell phone bill.  Several of the gift cards had been stolen in one of the aggravated robberies, and appellant’s cell phone had been used to make balance inquiries on them.  

3:
Nelson was detained for questioning but later released. 

4:
At the beginning of the hearing on the motion to suppress, the parties agreed the parameters of the motion were “the arrest of [appellant] for burglary of a motor vehicle and the property which was collected from that arrest; that being driver’s license, credit cards, cell phone, and phone bill, those items in his possession.” 

5:
Tex. R. App. P.
 33.1; 
see Mendez v. State
, 138 S.W.3d 334, 341–42 (Tex. Crim. App. 2004).
 

6:
See Buchanan v. State
, 207 S.W.3d 772, 776–78 (Tex. Crim. App. 2006).  Appellant’s trial attorney stated, “We are asking the Court to test their testimony whether or not the Court feels like probable cause existed for the arrest of my client by the Dalworthington Police Department.”
 

7:
Minnesota v. Dickerson
, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); 
Torres v. State
, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005).

8:
Buchanan
, 207 S.W.3d at 775; 
Torres
, 182 S.W.3d at 902
. 

9:
Woodward v. State
, 668 S.W.2d 337, 345 (Tex. Crim. App. 1982) (op. on reh’g). 

10:
Torres
, 182 S.W.3d at 902
.

11:
Parker v. State
, 206 S.W.3d 593, 596–97 (Tex. Crim. App. 2006); 
State v. Richardson
, No. 02-06-00033-CR, 2007 WL 495198, at *4 (Tex. App.—Fort Worth Feb. 15, 2007, pet. ref’d) (mem. op., not designated for publication).

12:
See
 
Wiede v. State
, 214 S.W.3d 17, 27–28 (Tex. Crim. App. 2007); 
Torres
, 182 S.W.3d at 902; 
Woodward
, 668 S.W.2d at 344 (holding that when there has been cooperation between law enforcement officers, the sum of the information known to the cooperating officers at the time of an arrest by any of the officers involved is to be considered in determining whether there was probable cause).

13:
Hoag v. State
, 728 S.W.2d 375, 379 (Tex. Crim. App. 1987).

14:
Wiede
, 214 S.W.3d at 24–25; 
Kothe v. State
, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004).

15:
Weide
, 214 S.W.3d at 25; 
Torres
, 182 S.W.3d at 902; 
Guzman v. State
, 955 S.W.2d 85, 87–88 (Tex. Crim. App. 1997).

16:
Importantly, there is no evidence that the Dalworthington Gardens officers suspected appellant of the October 2004 aggravated robberies and burglary or were even aware of those offenses at the time of appellant’s arrest.

17:
See Parker
, 206 S.W.3d at 596–97.

18:
See Hoag
, 728 S.W.2d at 378–80 (holding no probable cause to arrest suspect who had criminal history for burglary and who was observed walking suspiciously around houses and into two apartment complexes).

19:
Torres
, 182 S.W.3d at 902.

20:
E.g.
,
 Wong Sun v. United States
, 371 U.S. 471, 484–85, 83 S. Ct. 407, 416 (1963) (holding that both direct and indirect products of unlawful searches generally must be excluded); 
Bell v. State
, 724 S.W.2d 780, 787–91 (Tex. Crim. App. 1986) (applying attenuation of the taint analysis and concluding that the “immediate fruits” of the illegal arrest should have been suppressed), 
cert. denied
, 479 U.S. 1046 (1987); 
Boyle v. State
, 820 S.W.2d 122, 133 (Tex. Crim. App. 1989) (noting that where search “flow[ed] directly” from appellant’s illegal arrest, the evidence was not so attenuated as to be admissible), 
cert. denied
, 503 U.S. 921 (1992), 
overruled on other grounds by Gordon v. State
, 801 S.W.2d 899 (Tex. Crim. App. 1990).  
Appellant argues that the DNA obtained while he was in custody in Dalworthington Gardens was also fruit of the illegal arrest.  He did not, however, seek to exclude the DNA during the suppression hearing and did not object when it was later introduced at trial.  Therefore, appellant has waived any complaint that the DNA should have been suppressed and not admitted at trial.
  See
 Tex. R. App. P.
 33.1; 
see also Mendez
, 138 S.W.3d at 342 (holding “[e]xcept for complaints involving systemic (or absolute) requirements, or rights that are waivable only . . . all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)”).

21:
Castro v. State
, 202 S.W.3d 348, 359 (Tex. App.—Fort Worth 2006), 
rev’d on other grounds
, 227 S.W.3d 737 (Tex. Crim. App. 2007). 

22:
See Williams v. State
, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). 

23:
Mosley
, 983 S.W.2d at 259. 

24:
Wesbrook v. State
, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), 
cert. denied
, 532 U.S. 944 (2001).  

25:
Harris v. State
, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  

26:
Id.
 at 586. 

27:
This offense was one of two October 11, 2004 extraneous offenses admitted at trial due to the similarity of the offenses and their close proximity in time and distance to the first three home invasions. 

28:
See Malone v. State
, 163 S.W.3d 785, 800 (Tex. App.—Texarkana 2005, pet. ref’d) (holding error harmless beyond a reasonable doubt, considering the substantial evidence supporting the jury’s verdict, the nature of the items unlawfully seized, and the little emphasis placed on the evidence at issue); 
Strong v. State
, 138 S.W.3d 546, 555 (Tex. App.—Corpus Christi 2004, no pet.) (holding error admitting evidence was harmless where evidence was not especially probative, not emphasized, and the State relied on other evidence in meeting its burden). 

29:
See
 
Long v. State
, 203 S.W.3d 352, 352 (Tex. Crim. App. 2006); 
Jones v. State
, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003);
 
Castro
, 202 S.W.3d at 359
.

30:
See Brown v. Illinois
, 422 U.S. 590, 605, 95 S. Ct. 2254, 2262 (1975).

31:
Tex. R. App. P.
 44.2(a).