

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00034-CR
_____

TRAVIS ALSTON TURNER, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 21F1184-202

_____

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

After a Bowie County jury found Travis Alston Turner guilty of the murder of Jennifer Garrett, it assessed his sentence at life in prison, along with a $10,000.00 fine. Turner appeals, maintaining that the trial court (1) violated his Sixth Amendment right to counsel of his choosing when it required him to be represented by an attorney who was hired by his family, (2) erred when it denied his suppression motion, (3) erred when it did not include a jury-charge instruction addressing potentially illegally seized evidence, and (4) erred when it took judicial notice of the results of a competency evaluation without requiring the evaluator to testify at trial because (a) it was inadmissible hearsay and (b) it violated the Confrontation Clause. We affirm the trial court's judgment.

I.      Background

Paige Grady, one of Garrett's best friends, testified that the pair had attended school together since the time they were in seventh grade. According to Grady, Garrett had many friends and was very sociable. Garrett and Grady also worked at the same medical supply company, as the compliance assistant and the chief financial officer, respectively. Garrett was a dependable worker, and she was always on time for work.

Grady testified that she also knew Turner and that his personality changed according to wherever he was. Garrett and Turner dated during high school, but they were "off and on" after they graduated. Grady said that Garrett and Turner "just kind of [had] a private relationship . . . not a lot of people knew that they dated."

2

After graduation, Turner moved to Louisiana to attend college, but he returned to Texarkana in 2019, at which time he gradually began "staying" at Garrett's house. Grady said, "So just over time, it was like more and more of his shoes would be in her room, or his clothes would be on the floor, things like that." Grady testified that she had been privy to a confrontation between Garrett and Turner. According to Grady, she somehow dialed Garrett's cell phone number, at which point Grady heard Garrett screaming, "[D]on't put your F'ing hands on me." When Grady attempted to get Garrett's attention over the phone, Garrett did not respond. Grady said, "So eventually [Garrett] hung up the phone, and I tried to call her over and over, and she didn't answer. So [Garrett] called me back later." After the confrontation, Grady told Garrett that she overheard them fighting. Garrett told Grady that Turner was trying to give her a hug, but Grady did not believe her. On multiple occasions, Grady asked Garrett about what happened that day, but Garrett did not change her explanation.

Not long after that, Grady, Garrett, and their friend, Darius Reed, were on their way to have a night out when Garrett said that she needed to stop by her townhouse to pick up something. Grady and Reed were waiting in the car when they "saw a girl walk out of [Garrett's] door in SpongeBob pajama pants." Grady said, "And then shortly after that, [Garrett] came out, and she was hysterical. And she wouldn't tell us anything" about what had just happened.

From observing Garrett and Turner when they were together, Grady did not believe that Turner treated Garrett very well. Conversely, Grady felt like Garrett treated Turner "like a king." Regardless of Garrett's hesitancy to tell Grady anything about her relationship with

3

Turner, Grady continued to confront her about what was happening with Turner, but Garrett continued to remain unreceptive to her inquiries. Eventually, Grady and Garrett had a "falling out" over Turner's behavior toward Garrett, which led to the end of their friendship. Grady said that Garrett would try to "move on" but that Turner "would come back into the picture."

Caitlyn Pynes testified that Garrett and Turner's relationship was in trouble the entire time they were together. According to Pynes, Garrett was worried that Turner was being unfaithful to her and that her uncertainties caused tension in Garrett and Turner's relationship. For instance, when Turner's father passed away, Turner gave Garrett different versions of when and where the funeral would take place. Garrett was afraid to attend but decided that she would because Turner was her boyfriend. When she arrived at the funeral, Turner was sitting in the family section with another female. Pynes said, "[Garrett] was crushed and called me crying and very upset when she left there." According to Pynes, "[Garrett] gave [Turner] an unreasonable amount of grace considering his dad," and there were "no repercussions for doing that."

In May 2021, Turner moved out of Garrett's townhouse without giving her any notice. Turner then went to live at his mother's home where he remained until July 2021. During that time, Turner was arrested and charged with the offense of family violence after he allegedly assaulted his mother. According to Pynes, Turner had rules that Garrett was required to follow, such as, not speaking to his mother or anyone else while Garrett was in his mother's home. Pynes told Garrett, "[S]tay away from him. That's not normal."

Around 11:00 a.m., on August 12, 2021, Pynes was at work when she received a phone call from Garrett's co-workers, Reed and Brooke Kern, asking Pynes if she had spoken to Garrett

4

that day. Although Garrett and Pynes usually talked to one another every day, they had not spoken to each other that day. Pynes had not received a text from Garrett in response to a text she had sent her the night before. While Pynes was on the phone, Reed and Kern were on their way to Garrett's home to see if she was alright. Initially, they saw that Garrett's vehicle was at home. Furthermore, Pynes explained that she and Garrett shared their locations on their iPhones and that she could see that Garrett's phone was in her home. Pynes said, at that point, she became concerned, and she began thinking about leaving work to go check on Garrett.

By the time Pynes had the opportunity to leave work, the other co-workers had arrived at Garrett's home and gone to the door. When Turner answered the door, he told them that Garrett had not come home the night before. Shortly after that, Turner told Garrett's co-workers "that he was going to get food, and he left" in his "black BMW."

Before Pynes arrived at the townhouse with a key to Garrett's home, one of the co-workers informed Pynes by phone that they were about to use a credit card to enter the residence.[1] Pynes said that the coworker "was walking . . . through her every step on the phone." She said, "[O]kay, I've got the card. Okay. I'm at the door. And then all you hear is screaming, like the worst scream you could imagine." When Pynes arrived at the scene, she said that a co-worker "was coming out saying, don't go in." Ignoring the warning, Pynes "ran inside, and the first thing [she] could see right when [she] entered the door was [Garrett's] head on the couch." Pynes's first thought was that Turner might have "just knocked her out." She continued, "And I kept walking and got to the foot of the couch and just knew, like, looking at her that she was

---

[1]Garrett had shown her friends how they could get into her home by using a credit card to unlock the door.

dead." Pynes collapsed to her knees, and when she looked up, she saw Lindsey, who happened to be a medical student. Pynes asked Lindsey multiple times if Garrett was breathing, but Lindsey "just [shook] her head no." Eventually, Turner returned to Garrett's home where "he parked at the end of the street."[2]

That same day, Turner was arrested and charged with Garrett's murder. The State alleged in its indictment that Turner murdered Garrett by "impeding the normal breathing or circulation of" Garrett's blood by choking her. On January 31, 2023, jury selection took place, and the trial began later that day. On February 6, 2023, the jury found Turner guilty of murder and assessed his punishment at life in prison, along with a fine of $10,000.00. This appeal followed.

## II. The Trial Court Did Not Violate Turner's Sixth Amendment Right to Counsel

In his first point of error, Turner complains that the trial court erred when it did not allow him to secure counsel of his choice. "A criminal defendant has a right to secure counsel of his or her own choice." *Gilmore v. State*, 323 S.W.3d 250, 264 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988)). "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of representation he received." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).

However, "the defendant's right to counsel of choice is not absolute." *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex. Crim. App. 2003) (citing *Wheat*, 486 U.S. at 159). "[W]hile there is

_____

[2]The State presented multiple witnesses who were present the day of Garrett's murder. Their testimony was, for the most part, consistent with Grady's and Pynes's testimony.

a strong presumption in favor of a defendant's right to retain counsel of choice, this presumption may be overridden by other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *Id.* (citing *Wheat*, 486 U.S. at 158–60). Among other things, "a trial court[] [has] wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted); *see Childress v. State*, 794 S.W.2d 119, 121 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd) ("This right [to obtain counsel of one's own choice] cannot be manipulated so as to obstruct the orderly procedure in the courts and must be balanced with a trial court's need for prompt and efficient administration of justice." (citing *Thompson v. State*, 447 S.W.2d 920, 921 (Tex. Crim. App. 1969))); *see also Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982).

As a result, the question before this Court is as stated in *Gonzalez*, whether the "trial court['s actions] unreasonably or arbitrarily interfere[d] with [Turner]'s right to choose his counsel." *Gonzalez*, 117 S.W.3d at 837.

As early as the first pretrial proceeding in September 2021, the trial court asked Turner if he had an attorney to represent him. Turner informed the court that he was in the process of hiring one, but that he could not do so until he was released from jail. The court asked Turner if he had the financial ability with which to retain counsel. Turner responded, "Yes, sir, as soon as I go to misdemeanor court." The court asked Turner a second time if he would be able to hire an attorney, explaining to him that it would need to appoint an attorney if he was unable to afford to hire one.

7

The following month, during a second pretrial hearing, the trial court stated that Turner's family had hired Ron Davis to represent him. Davis did not appear that day, and the court reset the case to October 25, 2021. On October 25, Davis appeared on behalf of Turner, at which time Turner informed the court that Davis was not his lawyer. The trial court explained to Turner that his family had retained Davis. Turner responded, "But I said I wanted to hire my own attorney."

Two more pretrial hearings took place with no mention of Turner's choice of attorney or that he had been able to hire one. During a May 19, 2022, pretrial hearing, the trial court informed the parties that the case would proceed to trial on January 31, 2023.

Two months later, on July 6, Davis appeared for a pretrial hearing without Turner because Turner had been causing problems in jail.

On December 5, 2022, at the ninth pretrial hearing, the trial court reminded the parties that the trial was still set for January 30, 2023, noting, "We've been set for six months. So we're going January 30th." Davis informed the trial court that there needed to be a hearing as to who would represent Turner because Turner had made it clear to Davis that he did not want Davis representing him. The court informed the parties that it would set the requested hearing on January 5, 2023. At that juncture, Turner vehemently and repeatedly told the trial court in no uncertain terms that Davis was not his lawyer. Turner exclaimed, "[T]hat lawyer can't tell me sh[*]t."

From the initial pretrial hearing in September 2021, Turner complained of Davis's representation. He also informed the court that he could hire his own attorney. Almost a year and three months later, Turner continued to voice his dissatisfaction with Davis's representation;

8

yet, he never stated the reasons for his dissatisfaction, only that Davis was not his attorney and that Davis could not "tell [him] sh[*]t." In sum, Turner had well over a year to hire counsel of his choosing, but he failed to do so. The trial court had the discretion to weigh Turner's continued requests to terminate his relationship with his current counsel against his year-long failure to hire his preferred counsel. Furthermore, the trial court had a duty to ensure that its trial calendar moved efficiently and that Garrett's family was not forced to endure the emotional upheaval of waiting for Turner's trial to begin or for the trial to conclude.

For these reasons, we cannot say that the trial court violated Turner's right to counsel of his choice in violation of the Sixth Amendment to the United States Constitution or Article I, Section 10, of the Texas Constitution. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.

We overrule Turner's first point of error.

## III. The Trial Court Did Not Err When it Denied Turner's Motion to Suppress

In his second point of error, Turner maintains that the trial court erred when it denied his motion to suppress evidence that he contends was illegally seized from Garrett's home.

We must affirm the trial court's ruling on a suppression issue "if it is correct on any theory of law that finds support in the record." *Carrillo v. State*, 235 S.W.3d 353, 356 (Tex. App.—Texarkana 2007, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002)). This is because "[a] trial court's ruling on a motion to suppress is reviewed for abuse of discretion." *Kelly v. State*, 529 S.W.3d 504, 508 (Tex. App.—Texarkana 2017, no pet.) (citing *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999)). "In performing this review,

9

we apply 'a bifurcated standard of review.'" *Id.* (quoting *Myrick v. State*, 412 S.W.3d 60, 63 (Tex. App.—Texarkana 2013, no pet.)).

We give "almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing de novo other applications-of-law-to-fact issues." *Carrillo*, 235 S.W.3d at 355 (citing *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)). We also "afford nearly total deference to trial courts' rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (plurality op.)). We "review de novo mixed questions of law and fact not falling within this category." *Id.* at 355–56 (citing *Guzman*, 955 S.W.2d at 89). "[T]he burden of persuasion is properly and permanently placed upon the shoulders of the moving party. When a criminal defendant claims the right to protection under an exclusionary rule of evidence, it is his task to prove his case." *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005) (quoting *Mattei v. State*, 455 S.W.2d 761, 766 (Tex. Crim. App. 1970)).

Article 38.23(a) provides, in part:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a).

Turner argues that Kern, who was one of the first individuals to arrive at Garrett's home, illegally entered Garrett's property in violation of the law. According to Turner, any evidence

10

that was found after Kern's unlawful entrance should have been excluded at trial. "If a defendant challenges the admissibility of evidence under [Article 38.23(a)] on the ground it was wrongfully obtained by a private person in a private capacity, the defendant must establish that the private person obtained that evidence in violation of [the] law." *Mayfield v. State*, 124 S.W.3d 377, 378 (Tex. App.—Dallas 2003, pet. ref'd) (citing *Carroll v. State*, 911 S.W.2d 210, 220 (Tex. App.—Austin 1995, no pet.)). However, "[i]f no violation of the law occurred, [Article 38.23(a)] does not apply." *Id.* Therefore, we must determine whether Kern, or any of her other friends, committed a crime, such as trespass, when they entered Garrett's house without her permission.

The evidence showed that Garrett told her close friends, including Kern, that they were always welcome in her home, even if she was not there. Furthermore, Garrett showed her friends how they could enter her home by using a credit card. Moreover, Kern entered Garrett's home after Turner told her that Garrett was not there, knowing that Garrett's vehicle was at the townhouse, Garrett's cell phone was inside the home, Garrett was not answering her friends' repeated phone calls, Garrett's friends believed Turner had been mistreating her, Turner had left the scene, and Garrett had given her permission to go inside her home whenever she chose to do so. Simply stated, no law was broken when Kern entered Garrett's residence.

Despite that, Turner argues that he was the last person in the home and that he had not given Garrett's friends consent to go inside of the residence. Yet, there was no evidence that Turner had any ownership interest in the townhouse or that he was a co-tenant with Garrett. To the contrary, the evidence showed that Turner stayed overnight on some evenings but that, on

11

other nights, he did not stay there. In fact, Turner had moved out of Garrett's townhouse without even giving her any notice of his intent to do so. Simply put, the evidence did not show that Turner had as much of a right to enter Garrett's home as her friends did; in fact, he may have had far less.

For those reasons, the trial court could have determined that Garrett's friends, including Kern, did not violate the law when they entered Garrett's home, and therefore, Article 38.23(a) did not require the trial court to grant Turner's motion to suppress. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a).

As an alternative argument, Turner contends that the police had no right to enter Garrett's home without a warrant and that any evidence they found should have been suppressed. The State argues that Turner had no standing to object to the entry into, or the search of, Garrett's home. We agree with the State.

"The Fourth Amendment of the U.S. Constitution and Article I, Section 9, of the Texas Constitution protect individuals from unreasonable searches and seizures." *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (citing *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993) (plurality op.)). Furthermore, "[t]he rights secured by the Fourth Amendment and Article I, Section 9, are personal, and accordingly, an accused has standing to challenge the admission of evidence obtained by an 'unlawful' search or seizure only if he had a legitimate expectation of privacy in the place invaded." *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 139 (1978); *Richardson*, 865 S.W.2d at 948–49). The burden is on the defendant to prove the facts to demonstrate "a legitimate expectation of privacy." *Villarreal v. State*, 935 S.W.2d 134, 138

12

(Tex. Crim. App. 1996) (plurality op.). "He must show that he had a subjective expectation of privacy in the place invaded and that society is prepared to recognize that expectation of privacy as objectively reasonable." *Betts*, 397 S.W.3d at 203 (citing *Villarreal*, 935 S.W.3d at 138).

Turner claims that he had standing to object because "[his] attorney asserted [at trial] that Turner lived in the apartment." That is argument, not evidence. In the same vein, Turner now maintains that he had a reasonable expectation of privacy in Garrett's home and that he had apparent authority to give consent to enter the home because he "appeared to have been there that night" and because he answered the door when Kern knocked on it.[3] Turner's claims are based on speculation. There is no evidence as to when Turner arrived at Garrett's home, how he entered it, or even if he had permission to be there. Turner's argument is meritless.[4]

We overrule Turner's second point of error.

## IV. The Trial Court's Jury Charge Did Not Contain Error

Next, Turner argues that he was entitled to a jury instruction pursuant to Article 38.23 of the Texas Code of Criminal Procedure.

An Article 38.23 jury instruction is mandatory only when there is a factual dispute regarding the legality of the search. *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005); *Brooks v. State*, 642 S.W.2d 791, 799 (Tex. Crim. App. [Panel Op.] 1982); *Malone v. State*, 163 S.W.3d 785, 802 (Tex. App.—Texarkana 2005, pet. ref'd). In order to be entitled to

---

[3]During the hearing on Turner's motion to suppress, Turner's counsel informed the court that he would like to "outline[] what happened there at the residence of Jennifer Garrett and Travis Turner the morning of August 12th." Turner immediately stated, "That wasn't my legal residence."

[4]Moreover, there was testimony at trial that officers did not enter the residence until after a search warrant was signed by a judge.

such an instruction, "the defendant must show that (1) an issue of historical fact was raised in front of the jury; (2) the fact was contested by affirmative evidence at trial; and (3) the fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible." *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012) (citing *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007)). "Where the issue raised by the evidence at trial does *not* involve controverted historical facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court." *Id.*

In his brief, Turner states, "There was a fact issue as to whether the apartment was legally searched and evidence was legally seized by police." Specifically, Turner maintains that fact issues existed as to (1) whether Kern had Garrett's consent to enter the townhouse, (2) whether "Turner [had] a reasonable expectation of privacy in the [townhouse]," (3) whether the police had a valid "search warrant to search the [townhouse] and seize evidence," (4) "[i]f so[,] what was the timing and scope of the search warrant with regard to the timing and scope of the search," and (5) "[s]ince Garrett was dead, was there still a pending emergency."

With the possible exception of whether Kern entered Garrett's apartment with or without Garrett's consent, the remaining asserted issues are legal, not factual. Furthermore, there was no question that Kern entered Garrett's apartment by using a credit card and that Kern testified that Garrett had given her consent to do so; yet, Turner did not offer any affirmative evidence to contradict Kern's testimony. In fact, he did not offer any affirmative evidence to controvert any

14

of the alleged historical fact issues. As a result, Turner was not entitled to an Article 38.23 jury instruction.

We overrule Turner's third point of error.

**V.       The Trial Court Did Not Err When it Took Judicial Notice of One of Turner's Competency Evaluations When the Evaluator Did Not Testify**

Lastly, Turner argues that the trial court erred when it took judicial notice of an expert's report regarding Turner's competency to stand trial without requiring the expert to appear and testify during the competency hearing. According to Turner, the report was inadmissible hearsay, and its admission violated his right to confront and cross-examine the expert, in violation of *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

On January 5, 2023, the trial court conducted a competency hearing, where the court learned that Turner had not cooperated with Dr. Margaret Podkova, who was the mental health expert that had been hired by Turner to perform his competency evaluation. Podkova testified that she lacked the necessary information to opine whether Turner was competent, generally, to stand trial. But she did concede that, because there was a presumption of competence, Turner was competent on that day to stand trial.[5]

Notably, after Podkova unsuccessfully attempted to meet with Turner, Turner's counsel provided her with "a large file with police reports, as well as the initial psychological evaluation

_____

[5]Lance Cline, who is an investigator with the Bowie County District Attorney's Office, testified on behalf of the State. Cline testified that he had participated in Turner's case from the beginning. According to Cline, Turner's family noticed a distinct behavior change in him shortly after his father passed away. Prior to his arrest for Garrett's murder, Turner had been arrested in Texarkana, Arkansas, and was persuaded to go to a substance-abuse facility. Further, around the time of Garrett's murder, there had been an ongoing dispute about the distribution of his father's property, which included three to four million dollars' worth of rental property. Cline was asked whether Turner's bizarre behavior could have been caused by his alcohol and drug abuse, along with the family's dispute over his father's property, to which Cline answered, "That's correct."

15

by Dr. Smith [that had been prepared on November 17, 2021], as well as the addendum [to that evaluation], which [she] received" the day before the competency hearing. After reviewing the evaluation and the addendum, Podkova testified that, without any evidence to the contrary, Turner was competent to stand trial.

After hearing from both witnesses, the State asked the trial court to take judicial notice of Smith's competency evaluation and the addendum to it. In response, Turner's counsel stated,

> Judge, I don't -- procedurally, I object to the introduction of the reports. Of course, what we talked about from them is fair game. The person that did -- Dr. Smith is not here to be cross-examined, and it's hearsay because it's a document that would normally not be admitted. The testimony from the doctor would be admitted. So we just object to it.

The trial court stated, "I'm going to take judicial notice on the portions that were discussed and relied on by [Podkova] and discussed in cross and direct." The trial court then made a finding that Turner was competent to stand trial.

Even assuming, without finding, that the trial court erred when it took judicial notice of portions of Smith's evaluation in violation of the hearsay rule[6] and *Crawford*,[7] Turner has not shown that he was harmed by the trial court's ruling. First, the trial court made it clear that it was taking judicial notice of only those portions of Smith's report that Podkova relied upon in making her evaluation. Notably, it was Turner who supplied the file and Smith's evaluation to Podkova for her review. Had Turner had problems regarding Podkova's reliance on Smith's

---

[6]"The admission of inadmissible hearsay constitutes non-constitutional error subject to the harm analysis rule under Texas Rule of Appellate Procedure 44.2(b), which requires the reviewing court to disregard non-constitutional error that does not affect a criminal defendant's substantial rights." *Rivera-Reyes v. State*, 252 S.W.3d 781, 786 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing TEX. R. APP. P. 44.2(b)).

[7]*Crawford* error is constitutional error that is subject to a harm analysis. TEX. R. APP. P. 44.2(a); *McNac v. State*, 215 S.W.3d 420, 421 (Tex. Crim. App. 2007).

evaluation, he could have questioned her—and, in fact, he did—about those concerns during the competency hearing. In addition, while the trial court may have reviewed Smith's evaluation of Turner in finding that he was competent to stand trial, there is no indication that it relied only on Smith's opinion. Moreover, and as the State points out, Smith was not hired by the State to evaluate Turner. Had Turner had questions about Smith's evaluation, he was free to subpoena him to appear at the hearing. Furthermore, even without the court's consideration of Smith's evaluation, Turner, who had the burden to prove his incompetency, failed to do so. Lastly, the trial court presided over at least nine pretrial hearings, with Turner being present during the majority of those proceedings. During that substantial amount of time, the trial court had the opportunity to observe Turner to consider whether he had a basic understanding of the legal process and whether he understood the participants' various roles in that process.

Because Turner suffered no harm when the trial court took judicial notice of portions of Smith's competency evaluation, we overrule his fourth point of error.

## VI. Conclusion

We affirm the judgment of the trial court.


Charles van Cleef
Justice

Date Submitted:	October 30, 2023
Date Decided:	December 22, 2023

Do Not Publish

17